Kenneth L. SHAW, Petitioner,

v.

DISTRICT OF COLUMBIA POLICE AND FIREFIGHTERS' RETIREMENT AND RELIEF BOARD, Respondent.

No. 02–AA–287.

District of Columbia Court of Appeals.

Argued Feb. 6, 2007.

Decided Sept. 13, 2007.

Frederic W. Schwartz, Jr., for petitioner.

David A. Hyden, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General, were on the brief, for respondent.

Before GLICKMAN and KRAMER, Associate Judges, and BELSON, Senior Judge.

GLICKMAN, Associate Judge:

Petitioner Kenneth L. Shaw challenges the calculation of his annuity by the District of Columbia Police and Firefighters' Retirement and Relief Board (hereinafter referred to as "the Retirement Board" or "the Board"). We agree with Shaw that the Retirement Board's calculation rests on a determination of his earning capacity that is not supported by substantial evidence of available jobs that Shaw has the capacity to perform. We remand this case for a redetermination of Shaw's retirement annuity.

**I.**

Shaw was appointed to the District of Columbia Metropolitan Police Department (MPD) in 1990. In August of 1996, having been assigned to the MPD "warrant squad," Shaw injured himself in the course of making an arrest when he lost his balance and twisted his back. Following that injury, Shaw experienced chronic debilitating upper back pain, and an MRI scan revealed herniated discs in his thoracic spine. Dr. Michelle Smith–Jeffries, Medical Director of the Police and Fire Clinic, evaluated Shaw and concluded that he was "permanently disabled, with a functional impairment of 15%." The Clinic recommended to the Retirement Board that Shaw be considered for disability retirement.

On November 5, 1998, the Retirement Board held an evidentiary hearing on Shaw's disability claim. At the hearing, Shaw testified that he endures "constant" back pain, which is most intense when he

sits or stands for a "long period of time, say like an hour and a half." Shaw, a high school graduate, also testified that, before becoming a police officer, he had worked primarily in the mining industry as, among other things, a truck driver, crane operator, coal sampler, and mason. In addition, Shaw had worked at a bank for three months, where his job was to deliver mail to the post office. Shaw testified that while his job with the MPD warrant squad required him to prepare paperwork on computers, he generally was unfamiliar with word processing and sending e-mail, and he claimed that he could only type three words per minute.

Dr. Smith–Jeffries testified about Shaw's injuries, treatment history, and prognosis, opining that, even with his back injury, Shaw could perform "sedentary and light work." She identified various jobs listed in the Job Bank maintained by the District of Columbia Department of Employment Services (hereinafter referred to as the "Job Bank") that she believed Shaw would have the physical ability to perform. Dr. Smith–Jeffries stated that if she "had to write a [work] restriction for [Shaw]" she would impose a "guideline" that "if he has been sitting for an hour, he should be allowed [15 minutes] to stand, walk around, change his position." According to Dr. Smith–Jeffries, if Shaw were not given the chance to stand or change positions every hour, "by the end of the day he would just have back aggravation to the extent that he would not be able to perform the job effectively."

On February 8, 1999, the Retirement Board ruled that Shaw's condition disabled him "for useful and efficient service" with the MPD, that he had incurred his back injury in the performance of duty, and that he should receive a retirement annuity pursuant to D.C.Code § 4–616 (1981) (re-codified as D.C.Code § 5–710 (2001 & 2006 Supp.)). The Board used the following standard formula to calculate Shaw's annuity:

$(A-B)/A = C$, and $C \times D = E$, where

A = the current salary of the position last held by the service member;

B = the average salary of the positions the member has the capacity to occupy;

C = the percentage of disability;

D = 70% of the member's basic salary; and

E = the amount of the annuity (provided that the amount of the annuity awarded shall not be less than 40% of the member's basic salary where (as here) the member became disabled in the performance of duty).

*See* 7 DCMR § 2515.3; D.C.Code § 4–616(e)(2)(D) (1981) (re-codified as D.C.Code § 5–710(e)(2)(D)). To determine the variable "B," the Retirement Board identified five positions listed in the Job Bank that it believed Shaw to be capable of performing: "claim administrator," "research assistant," "sales associate," "probation clerk," and "copy machine operator." [1] Inserting the average salary of these positions into the computation resulted in a figure that was below 40% of Shaw's basic salary, so the Board awarded Shaw the latter sum as his annuity.

Shaw appealed the Retirement Board's decision, asserting that it was arbitrary, capricious, and not supported by the record. While the appeal was pending, this court decided *Jewell v. District of Columbia Police and Firefighters' Retirement and Relief Board*, 738 A.2d 1228 (D.C. 1999), in which we reversed a Board order

---

1. Without explanation, the Board concluded that Shaw met the "physical, intellectual, educational (or training), and experience requirements" of the jobs it selected.

in a similar case.[2] The District of Columbia thereupon filed a motion, which we granted, to remand Shaw's case to the Board for additional findings concerning his earning capacity. The Retirement Board held the remand hearing on Shaw's claim on October 12, 2000.

At the hearing, the Chairperson of the Retirement Board stated that the Board's main focus on remand was "not to go back through the whole disability retirement process, but to get some clarification on the record with regard to ... positions that [Shaw] could compete for in his partially disabled state." Over Shaw's objection, the Board accordingly decided to consider his capacity to perform jobs listed in the Job Bank in 1998, when Shaw first "came before the Board for disability retirement consideration," even though those jobs might no longer be available in the current (year 2000) labor market. Using more current listings, as Shaw requested, would, in the words of one Board member, improperly take the proceedings "outside the record" on remand.

Shaw's former supervisor in the warrant squad, Lieutenant Benjamin Preston, testified at the remand hearing. Lieutenant Preston explained that Shaw's main duty on the squad was to "research the target of the investigation [and] do a report and present the documents indicating if the individual was deceased [or if] he was still alive. He would research and try to ... pinpoint him to a certain location. Once he's done that, we'd go out and effect arrest." According to Lieutenant Preston, in conducting his research Shaw would check computer databases to "see if the individual had been previously arrested,"[3] contact other government agencies, and interview people "in the field." After a suspect was arrested, Shaw typically would write a report which Lieutenant Preston characterized as not "too technical."[4] Lieutenant Preston believed that Shaw had excellent communication skills; that he had the ability to "comprehend" work documents; and that he had interview skills and the "type of community skills" which allowed him to "relate to the public to obtain the information" he needed. The lieutenant testified that Shaw was "trained to use the computer for the work that he [was] responsible for" with the warrant squad, and that he "was able to apply" what he learned in his on-the-job training.

After hearing from Lieutenant Preston, the Retirement Board re-called Dr. Smith–Jeffries to testify as to Shaw's employment capabilities. Basing her opinions on the

---

2. We held in *Jewell* that there was not substantial evidence in the record to support the Board's finding that Jewell could perform the job of "junior secretary." While the position called for someone who could type 40 words per minute, Jewell testified without contradiction "that she had never worked as a secretary; that she could not type very well; and that her typing speed was about five words per minute." *Id.* 738 A.2d at 1230. Because the record therefore "show[ed] that Jewell could not meet the minimum qualifications for the position," we remanded the case to the Board for a recalculation of Jewell's annuity. *Id.* at 1231.

3. Lieutenant Preston explained how Shaw used the computer database: "Well, you basically [input] ... your known information, name address, et cetera, like that ... And from there, another item came up that was a cross-reference, and you would try to get into that database, and you would go through the proper agency to get it." Lieutenant Preston estimated that Shaw probably spent "maybe 60, 70 percent" of his time using computers, but could not say definitively because he did not "micro-manage" Shaw's work.

4. Shaw testified that his reports were typically five or six sentences long. "Basically when we'd write a report, we'd say the above time, date, location, and we'd say the offense and whether there was an arresting name or not, basically."

extent of Shaw's physical disability and on what she believed his duties would be in a given job,[5] Dr. Smith–Jeffries opined that Shaw was capable of working as, among other things, a "probation clerk," "social service representative," "claim administrator," "receptionist/administrative assistant," and "rental sales agent." The requirements for these positions were set forth in the Job Bank listings, in part via cross-references to job descriptions in the *Enhanced Guide for Occupational Exploration* (hereinafter referred to as the "*Enhanced Guide*"), a standard reference work co-authored by the United States Department of Labor. Shaw objected that he could not satisfy the stated experience requirements for these job listings, having never worked at such jobs previously. Board members expressed disagreement, viewing Shaw's "nine years of police experience" as "an adequate substitute for the actual experience that is needed." In closing argument, Shaw responded that an experience requirement "doesn't necessarily mean that it has to be specific experience, but it has to be . . . equivalent experience." Shaw argued that his previous work experience did not qualify him for the specified positions.

The Retirement Board issued its decision on February 21, 2002. The Board reaffirmed its initial determination three years earlier that Shaw's work-related back injury had disabled him "for useful and efficient service" and held that he should receive a retirement annuity. This time, however, in applying the annuity formula, the Board used the average salaries for the positions of "probation clerk," "social service representative," "claim admin-

istrator," "receptionist/administrative assistant," and "rental sales agent." (The Board explained that it used 1998 Job Bank data rather than more recent listings because Shaw's case had been remanded "to rectify a mistake made" when Shaw was retired initially in February of 1999, "and thus [the Board] is required to use the original Job Bank Listing used in the initial hearing.") Referring to the requirements set forth in the Job Bank listings and (except for the rental sales agent position) the corresponding descriptions in the *Enhanced Guide*, the Board concluded that Shaw had the "capacity to occupy" these jobs "based upon the evidence of [his] impairment, his prior work experience and educational experience, his ability to comprehend tasks . . . [and] his ability to acquire the necessary skills." Using the average salary of the five positions ($20,081) to compute an annuity resulted in a figure ($17,351) that was less than 40% of Shaw's basic salary ($18,028). The Board therefore awarded Shaw the latter amount as his annuity.

## II.

Shaw challenges the Retirement Board's decision on two grounds. He contends (1) that the Board lacked substantial evidence to find that he had the capacity to perform some if not all of the five jobs it relied on to determine his annuity, and (2) that the Board erred by relying on Job Bank listings from 1998 instead of more up-to-date listings of jobs available in 2000 when the remand hearing was conducted. The latter claim is foreclosed by this court's recent decision in *Bausch v. District of Co-*

---

**5.** Dr. Smith–Jeffries was not shown to be qualified as an expert in employment, vocational counseling, occupational therapy, or related matters, and no evidence was presented regarding the foundation for her opinions concerning Shaw's capacity to perform various jobs. Shaw, however, did not object at the hearing to the witness's lack of qualifications or the lack of a foundation for her opinions, and he has not raised such a claim on appeal.

*lumbia Police & Firefighters' Retirement & Relief Bd.*, 926 A.2d 125 (D.C.2007), which upheld the Retirement Board's decision in a remand hearing to compute an annuity using salaries as of the time the petitioner initially was retired on disability rather than as of the later proceedings on remand. *See id.* at *127.[6] There is merit, however, in the former claim.

■ We review a decision of the Retirement Board to ensure that it "(1) made findings of fact on each material, contested factual issue, (2) based those findings on substantial evidence, and (3) drew conclusions of law which followed rationally from the findings." *Beckman v. District of Columbia Police & Firefighters' Retirement & Relief Bd.*, 810 A.2d 377, 384 (D.C.2002) (internal quotation marks and citations omitted). "If the decision is not supported by substantial evidence in the record, we must set it aside." *Bausch v. District of Columbia Police & Firefighters' Retirement & Relief Bd.*, 855 A.2d 1121, 1124 (D.C.2004); *see also* D.C.Code § 2–510(a)(3)(E) (2001). "Substantial evidence is more than a mere scintilla. It is relevant evidence such as a reasonable mind might accept as adequate to support a conclusion." *Epstein, Becker & Green v. District of Columbia Dep't of Employment Servs.*, 812 A.2d 901, 902–03 (D.C.2002)

(internal quotation marks and citations omitted).

■ In calculating an annuity, the Retirement Board considers the average salary for positions that the disabled petitioner "has the *capacity* to occupy." *Breen v. District of Columbia Police & Firefighters' Retirement & Relief Bd.*, 731 A.2d 843, 845 (D.C.1999) (citation omitted). The Board need not find that such jobs are "*actually* available to petitioner," only that they are "potentially available." *Id.*

Shaw claims that the Retirement Board erred in finding him capable of filling the positions of "probation clerk," "social service representative," "claim administrator," "receptionist/administrative assistant," and "rental sales agent." He contends that the evidence of record does not support the Board's findings that he is qualified for these jobs, given his work experience and skills. We agree with him as to the first two positions.[7]

*Probation Clerk and Social Service Representative*

■ The Job Bank listings for the positions of probation clerk and social service representative both refer to the same detailed job description in the *Enhanced Guide.* According to that description,

**6.** Our opinion in *Bausch* noted, *inter alia,* that the Board's ruling was "consistent with the statute's mandate that a firefighter's annuity 'shall be' calculated based on his salary 'at the time of retirement.'" *Id.* at *127 (quoting D.C.Code § 5–710(e)(2)(D)). We also saw "no reason to treat two retirees with the same percentage of impairment and disability differently merely because the ... Board erred in its original calculation, where there has been no financial prejudice as a result of the error." *Id.* at *130.

**7.** Shaw also argues that the record does not support the Board's finding that he is *physically capable* of performing the jobs because there was not a "shred of evidence, much less

a scintilla, that any of these positions could accommodate an individual who was unable to remain in one position for more than 60–90 minutes without requiring 15 minutes in another position." Brief of Petitioner at 8. We find this argument unpersuasive. It is reasonable to assume that Shaw would be allowed to reposition himself every hour while working any of the selected jobs, particularly because his employers likely would be subject to "reasonable accommodations" requirements imposed by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12112. Shaw has furnished us with no reason to think otherwise.

which the Board quoted and relied on, the employee in those positions:

Counsels juvenile or adult offenders in activities related to legal conditions of probation or parole: Confers with offender, legal representatives, family, and other concerned persons, and reviews documents pertaining to legal and social history of offender to conduct pre-hearing or pre-sentencing investigations and to formulate rehabilitation plan. Compiles reports, testifies in court, and makes recommendations concerning conditional release or institutionalization of offender. Informs offender or guardian of legal requirements of conditional release, such as visits to office, restitution payments, or educational and employment stipulations. Counsels offender and family or guardian, helps offender to secure education and employment, arranges custodial care, and refers offender to social resources of community to aid in rehabilitation. Evaluates offender's progress on follow-up basis including visits to home, school, and place of employment. Secures remedial action by court if necessary. May be employed by correctional institution, parole board, courts system, or separate agency serving court. May specialize in working with either juvenile or adult offenders. May specialize in working with offenders on probation and be designated Probation Officer. . . . May specialize in working with offenders on parole and be designated Probation Officer.

According to the Job Bank, the social service representative also would be required to "[p]rovide family, social, mental health, etc. services to persons court ordered into program; screen [ ] court orders; recommend [ ] services; visit [ ] homes, write [ ] reports, etc." The Job Bank listings further state that the social service representative position requires a high school education and 12 months of experience, while the probation clerk position requires a high school education, 24 months of experience, U.S. citizenship, and completion of a background check.

The Board found that Shaw "possesses the necessary skills and experience to adequately perform" the probation clerk job because he

developed the ability to review information regarding an offender's legal and social history as evidenced by his position on the [MPD warrant squad]. Member was proficient in using computerized record systems to track down individuals as evidenced by the fact he was trained to use a computer to see if someone had been arrested before. Member was also able to cross-reference information he obtained from one source to other agencies that were logged in the computer. Member has the ability to conduct pre-hearing and pre-sentencing investigations. . . . Member's Lieutenant testified that member possessed good communication skills as well as the ability to comprehend materials he read. Community relations were a big part of member's job and a lot of the information he obtained came from the community. . . . According to Lt. Preston member "possessed very excellent skills" and "communication skills."

In similarly concluding that Shaw could work as a social service representative, the Board also found him "capable of writing reports as evidenced by the duties he performed on the [warrant squad]."

In our view, the Board's reasoning is unpersuasive and its findings are not supported by substantial evidence. As described,[8] the positions of probation clerk

---

8. We have given some consideration to the possibility that the *Enhanced Guide* job de-

and social service representative involve extensive counseling of individuals in the criminal justice system, formulating rehabilitation plans on their behalf, recommending and providing social services for them, ensuring that they receive adequate services upon release, and evaluating their progress. Shaw, who has spent virtually all of his working career in the mining industry and in law enforcement, has no training, educational background, or experience in this type of social work. Although Shaw's experience with the MPD is relevant in the sense that it allowed him to become familiar with the criminal justice system and with government agencies, Shaw testified without contradiction that during his time with the warrant squad, he never referred anyone to "family, social, mental health, or other services" and never visited "homes and wr[ote] reports as to the social interaction of the people in the house." Nor does it appear that Shaw has the skills and training to write the type of comprehensive, analytical reports reportedly encompassed in the probation clerk and social service representative jobs. Shaw testified that the reports he wrote for the warrant squad, which Lieutenant Preston described as not "too technical," were only five or six sentences long, and merely provided basic information about a given arrest. While we agree with the Board that the record reflects that Shaw has investigative, interview, and communication skills, the two positions in question require a level of training and expertise that Shaw does not have. Shaw has the ability to learn, but the record is silent as to the training he would need to receive to

be qualified for either position. There likewise is no evidence in the record that the availability of on-the-job training would allow him to be hired despite his lack of the necessary qualifications. Accordingly, we hold that the Retirement Board did not have a substantial evidentiary basis on which to find that Shaw could work as a probation clerk or a social service representative.

*Claim Administrator, Receptionist/Administrative Assistant, and Rental Sales Agent*

■ Shaw also contends that the Board did not have substantial evidence to support its findings that he is capable of working as a claim administrator, a receptionist/administrative assistant, and a rental sales agent. With these claims we do not agree.

According to the *Enhanced Guide*, the claim administrator job involves processing automotive warranty claims for an insurance company using a computerized records system. The Job Bank listing for the position states that the applicant must have a high school education, 12 months experience, "excellent organizational skills" and be able to provide "strong customer service." The Board found that Shaw could perform the job because he had "strong organizational skills and strong customer service skills," as evidenced by his work with the MPD warrant squad. We think that there is substantial evidence in the record to support this finding. Lieutenant Preston, Shaw's former supervisor at MPD, testified that Shaw had

---

scription is not an accurate depiction of the duties of a probation clerk or social service representative (even though the Job Bank listings specifically referred to that job description). If not, however, the Board had too little information about the actual duties of the jobs, and the qualifications, skills and experience needed to fill them, to support its

decision. Moreover, the Board rested its decision on its finding that Shaw could perform the activities described by the *Enhanced Guide,* and we are not at liberty to uphold the Board on a different rationale. *See Pierce v. District of Columbia Police and Firefighters' Retirement and Relief Bd.,* 882 A.2d 199, 210 (D.C.2005).

"excellent communication skills," maintained an "effective working relationship" with his superiors and peers, used "tact and diplomacy" when dealing with the public, and had the "ability to relate to the community." In light of that testimony, although Shaw has not had experience as a claim administrator, we uphold the Board's conclusion that Shaw's other experience and skills would serve him in the customer service context. The Board reasonably could assume that Shaw would be able to learn how to operate the insurance company's computerized records system, especially since he regularly used computers as part of his job with the MPD.

■ Similarly, we are satisfied that substantial evidence supported the Board's finding that Shaw could work as a receptionist/administrative assistant. The Job Bank listing for the position states that the applicant must have a high school education, six months experience, and "some computer experience in Microsoft Word & Excel." The listing also states that "[t]his is an entry level position where employee can learn & grow within the company." The corresponding listing in the *Enhanced Guide* describes the job as involving various basic administrative and clerical duties.[9] As discussed above, Shaw often used computers in his work with the MPD,

and he acknowledged that he knew how to operate copy machines and telephones. Although Shaw denied being familiar with Microsoft Word and Excel, the Board reasonably could conclude that he would be able to learn how to use those programs with some training.[10]

■ Lastly, we reach the same conclusion as to the rental sales agent position. The Job Bank listing indicates that the position is that of a rental car agent at National Airport. The listing requires the applicant to have a high school education, 12 months of experience, and "excellent communication skills." The listing also states that the hired employee would receive "two weeks of computer training."[11] The Board's determination that Shaw could perform this job was supported by Lieutenant Preston's testimony that he "possesses excellent communication skills" and "above average" computer skills, among other evidence.

### III.

We hold that the Retirement Board erred in basing its annuity calculation on findings unsupported by substantial evidence that Shaw could work as a probation clerk and a social service representative. These errors were not harmless. If, for example, the Board had relied solely on

9. The listing states that the employee:
   Receives callers at establishment, determines nature of business, and directs callers to destination. Obtains caller's name and arranges for appointment with person called upon. Directs caller to destination and records name, time of call, nature of business, and person called upon. May operate PBX telephone console to receive incoming messages. May type memos, correspondence, reports, and other documents. May work in office or medical practitioner or in other health care facility.... May issue visitor's pass when required. May make future appointments and answer inquiries.... May perform variety of clerical

duties ... and other duties pertinent to type of establishment. May collect and distribute mail and messages.

10. The fact that Shaw testified that he could type only three words per minute did not disqualify him. Unlike the junior secretary position in *Jewell, supra,* the receptionist/administrative assistant job here does not require an applicant to be a proficient typist.

11. In addressing Shaw's ability to fill the rental sales agent position, the Board considered only the job description in the Job Bank listing, without regard to any corresponding description in the *Enhanced Guide.*

the other specified positions to determine the average salary of the jobs Shaw was capable of performing, the Board would have calculated his annuity to exceed the statutory minimum. We therefore reverse and remand for the Board to redetermine Shaw's annuity in a manner not inconsistent with this opinion.

*So ordered.*