Chad A. **LEACH**, Petitioner,

v.

**DISTRICT OF COLUMBIA POLICE AND FIREFIGHTERS' RETIRE-MENT & RELIEF BOARD**, Respondent.

No. 06–AA–844.

District of Columbia Court of Appeals.

Argued Dec. 11, 2007.

Decided Feb. 19, 2009.

James W. Pressler, Jr., Washington, for petitioner.

Pastell Vann, Senior Assistant Attorney General, with whom Linda Singer, Acting Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Ed-

ward E. Schwab, Deputy Solicitor General at the time the brief was filed, were on the brief for respondent.

Before FISHER and BLACKBURNE-RIGSBY, Associate Judges, and BELSON, Senior Judge.

BLACKBURNE-RIGSBY, Associate Judge:

Petitioner Chad A. Leach (hereinafter "FF Leach"), a firefighter injured when he responded to the Pentagon after the September 11, 2001 attack, seeks review of a decision of the District of Columbia Police and Firefighters' Retirement and Relief Board ("Retirement Board" or "Board"). The Board retired him based on a medical diagnosis of chronic obstructive pulmonary disease due to smoke inhalation and psychological disabilities of Chronic Post Traumatic Stress Disorder and Chronic Major Depressive Disorder. FF Leach contends that the District of Columbia ("the District") failed to rebut his *prima facie* showing that his back injury, which required significant surgery and the fusion of two vertebrae, occurred on September 11th in the performance of his duty. He also argues that his functional impairment and percentage of disability should be no less than total disability because the District failed to establish, in light of his physical and mental disabilities and limited vocational skills, that he was capable of being gainfully employed. We conclude that the Board did not sufficiently articulate the factual conclusions upon which it based its order, and thus we cannot determine from this record whether the order is supported by substantial evidence. We

therefore reverse the Retirement Board's Order and remand the case for further proceedings in accordance with this opinion.

I.

A. Factual Background

FF Leach retired from the District of Columbia Fire and Emergency Medical Services Department on June 30, 2006, after five and one half years of service. When the plane struck the Pentagon on September 11, 2001, seeing the events unfold on television, FF Leach left his family in Virginia and reported for work before the emergency call-in of all Fire Department personnel was issued by the department. He was off duty, and at that time he had less than a year of experience with the fire department. FF Leach was assigned to a "search and rescue" mission in the burned out section of the Pentagon. While searching for potential living victims in the deepest ring of offices, FF Leach was exposed to the gruesome sights and stenches of incinerated corpses.

While inside the Pentagon, upon order from his lieutenant,[1] FF Leach attempted to smash some windows with an axe to ventilate the area, but the windows would not break because they were constructed from bulletproof glass. FF Leach testified that he remembered hearing and feeling a "pop" in his back after the third strike on the glass, but he did not say anything at the time because he did not want to have to come out of the Pentagon and leave others in there. He also remembered gasping for air and when his temperature

---

1. The lieutenant also instructed FF Leach not to wear his oxygen mask when they entered the Pentagon. The lieutenant was apparently trying to conserve air because he did not know what they would encounter once inside and the lieutenant wanted to ensure that if something happened then the firefighters would have a sufficient air supply. At trial, FF Leach expressed the view that he had been taught or trained at school "whenever you're around smoke, keep your mask on." He believes that had he kept his mask on or done as he was trained, he would not have suffered pulmonary problems.

rose to 104 degrees, he lost consciousness and was evacuated to Alexandria Hospital for treatment of smoke inhalation injuries, hypoxemia and dehydration.

On September 14, 2001, FF Leach reported to the Police and Fire Clinic for an evaluation, where his complaints were fatigue, insomnia, and anorexia. He was referred to the Behavioral Services Department, where he began aggressive treatment for Acute Stress Disorder. FF Leach went back to full duty on March 1, 2002, but suffered a serious relapse by November 13, 2002, at which time he met all the criteria for Post Traumatic Stress Disorder. On December 29, 2002, FF Leach presented himself to Kaiser Permanente Urgent Care with symptoms consistent with sinusitis. The provider also noted that FF Leach had lower back pain that was aggravated by lifting an object the previous day at work.

On January 30, 2003, FF Leach was evaluated for his lower back pain, and an MRI of the lumbrosacral spine on February 1, 2003, revealed a herniated disc at L5–S1 without nerve root compression. He was placed on sick leave with his last full day of work being March 30, 2003. On April 23, 2003, FF Leach presented himself at the Police and Fire Clinic for persistent lower back pain and was referred to Steven Hughes, M.D., who diagnosed him with chronic lower back pain.

On August 20, 2003, an occupational disability evaluation was performed on FF Leach at Kaiser Permanente. Sylvia R. Medley, M.D., completed a comprehensive disability worker's compensation examination of FF Leach. She wrote:

[d]ue to the time sequence of the patient's clinical course, there is evidence to suggest a direct causation of his symptoms and clinical findings with his exposure to smoke and the physically strenuous nature of his job as a firefighter to his asthma and to his lower back pain with radiculopathy. His post traumatic syndrome appears to be related as well due to the unique circumstances of September 11, 2001.

Based upon his back pain, new onset asthma with severe partial obstructive lung disease, and post traumatic stress syndrome, which Dr. Medley appears to attribute to FF Leach's work as a firefighter on September 11th, she assigned an impairment rating of 26% of the whole person. Although he had physical therapy and epidural steroid injections for the pain, FF Leach underwent an anterior diskectomy with bone graft fusion on June 23, 2004, to repair his lower back.

On November 30, 2004, FF Leach was the subject of a disability evaluation at the Police and Fire Clinic by Michelle Smith–Jefferies, M.D. Dr. Smith–Jefferies recounted every visit FF Leach made to the Police and Fire Clinic and Kaiser Permanente. Under the heading "Impact of Medical Condition on Ability to Perform Functions of Job," Dr. Smith–Jefferies wrote, "Firefighter Leach injured his back while fighting a fire at the Pentagon September 11, 2001. He also suffered from smoke inhalation injury." She found that pulmonary function studies suggest severe smoke inhalation asthma, and FF Leach continued to experience shortness of breath, particularly with minor activities. She opined that he was unable to perform the full duties of a fire fighter and that his condition was "not the result of vicious habits or intemperance." Lastly, she concluded that he was permanently disabled with a functional impairment of 33%.

On December 24, 2004, C. Richard Filson, Ed.D., a licensed psychologist of the Police and Fire Clinic, prepared a retirement report recommending that FF Leach be considered for disability retirement. Dr. Filson diagnosed him with Chronic Post Traumatic Stress Disorder and Chronic Major Depressive Disorder, mod-

erately severe without psychotic features. Dr. Filson found that the magnitude of these combined related traumas, as well as depressive symptoms completely disabled FF Leach from returning to fire fighting. Dr. Filson also noted that FF Leach did not exaggerate or aggrandize any of his symptoms.

On April 1, 2005, the National Rehabilitation Hospital issued a Labor Market Survey identifying five jobs that were determined to be suitable full-time employment for FF Leach. The report was signed by a vocational rehabilitation coordinator and vocational rehabilitation counselor. The survey stated that with vocational guidance, FF Leach might consider vocational options such as customer service, file clerk, or dispatcher. Out of the five jobs selected for FF Leach, three were customer service positions; one was for an office clerk; and one was for front desk support.

Phillip Bussey, Ph.D., CRC, a vocational rehabilitation expert, also completed a vocational evaluation of FF Leach, and issued a report on July 12, 2006. Dr. Bussey evaluated FF Leach's ability to work, in consideration of his medical and psychological work-related injuries, and in light of his age, education, work experience, and residual physical capacities. Dr. Bussey noted that prior to firefighting, FF Leach's only work experience was in landscape labor. Based on these considerations, Dr. Bussey determined that there were no suitable jobs identified in the Department of Employment Services Job Bank Listings or the Labor Market Survey. Dr. Bussey found that FF Leach had not developed job skills that readily carry over to less physically demanding work, and given the limitations imposed on him by his disabilities, he was not employable without vocational rehabilitation. In sum, Dr. Bus-

sey found that FF Leach did not have marketable job skills that would allow him to return to a productive work life, and he was, therefore, totally disabled.

At FF Leach's retirement hearing, Dr. Filson testified that FF Leach's near death experience, where he nearly ran out of air, combined with seeing the charred bodies, makes his post traumatic stress experience more profound. Dr. Filson opined that in his eight years of experience providing expert testimony before the Retirement Board, the Retirement Board has never seen a case of post traumatic stress like FF Leach. Dr. Filson observed that the physical trauma of a near death experience, combined with the emotional trauma created a particularly profound case of post traumatic stress disorder. Both Dr. Filson and Dr. Smith–Jefferies agreed that they believed that FF Leach could work, but only if a job existed that met his specific disabilities both physically and mentally. They deferred to the vocational experts to prove that such a job or jobs existed.

Dr. Smith–Jefferies testified that FF Leach's back injury probably was the result of something other than September 11th despite her December 10, 2004, report where she never indicated any reason for the back injury except the September 11, 2001, incident. Specifically, Dr. Smith–Jefferies testified:

> Dr. Smith–Jefferies: The back injury also, the timing was a bit of an issue. I believe that when he had the initial injury, he said that he felt a pop in his back, and that's what he recounted to me later. If you look at page 124 and 125, he did not report back pain or the popping at the time he was seen in the hospital. It wasn't until—it looks like January 2003 when we had the first reports of back pain.[2] We have a two-week issue

2. The record shows that FF Leach's first report of back pain was actually on December

29, 2002 when a Kaiser provider examined

of low back pain, and then in 1996, I guess his doctor who he was seeing, [at] Kaiser, refers to an episode of back pain in 1996.[3] So again, the timing on the back pain is not right in terms of attributing his back pain to the September 11th. In retrospect, he says he ... felt a pop on September 11th, but there really in the record is not a report of back pain until January 2003.

**Ms. Hicks:** So you would not expect that ...

**Dr. Smith–Jefferies:** No, I wouldn't expect that.

**Ms. Hicks:** To go pain-free until over a year or two years later, really?

**Dr. Smith–Jefferies:** Right, I would not expect that.

**Ms. Hicks:** So in your medical opinion, is it more likely than not that his back pain occurred from something else?

**Dr. Smith–Jefferies:** I think that it's more likely that the back pain occurred from something else.

### B. Retirement Board's Ruling

The Retirement Board found that, as a result of the September 11th events, FF Leach suffered from chronic obstructive pulmonary disease, due to smoke inhalation, and psychological ailments in the form of chronic post traumatic stress disorder and chronic major depressive disorder. The Retirement Board chiefly relied on the testimonies of Dr. Filson and Dr. Smith–Jefferies to determine that the pulmonary disease and FF Leach's psychiatric diagnosis could be attributed to the September 11th incident.

The Retirement Board, however, concluded that the back injury, specifically the status post anterior diskectomy, L5–S1,

was not related to September 11th. The Board noted "Dr. Smith–Jefferies testified that the back injury more likely occurred from something other than an on duty incident." The Board specifically credited Dr. Smith–Jefferies's testimony that,

> The back injury also, the timing was a bit of an issue. I believe that when we had the initial injury, [FF Leach] said that he felt a pop in his back, and that's what he recounted to me later.... [H]e did not report back pain or popping at the time he was seen in the hospital.

Thus, the Retirement Board concluded, "the medical diagnosis of status post anterior diskectomy, L5–S1, is a non-performance of duty injury."

Finally, the Board found that FF Leach's physical and psychological issues precluded him from performing useful and efficient service in a full duty status with the fire department. However, the Retirement Board concluded that FF Leach had the physical and intellectual capacity, education/training, and experience to occupy other employment in the D.C. Metropolitan area. While the Retirement Board took Dr. Bussey's report into consideration, which objected to the jobs in the Labor Market Survey, the Board did not to rely on the report "because [it] described positions [FF Leach] may be able to perform based on his limitations and skill-set."

### II.

In calculating an annuity, the Retirement Board considers the average salary for positions the disabled petitioner "has the *capacity* to occupy." *Shaw v. District of Columbia Police & Firefighters' Ret. &*

---

FF Leach and noted an elevation of low back pain caused by lifting an object at work the previous day. Dr. Smith–Jefferies's report erroneously notes the date of this examination as December 2, 2002.

3. Dr. Smith–Jefferies' report states that there was "a negative MRI of the lumbosacral spine in 1996."

*Relief Bd.*, 936 A.2d 800, 805 (D.C.2007) (citations omitted) (emphasis in original). Using the Labor Market Survey performed by the National Rehabilitation Hospital, the Retirement Board found that FF Leach had the capability to perform full-time work as a customer service representative, office clerk, and front desk support. FF Leach contends that the Retirement Board's decision ignored the expert opinions of Dr. Filson, who determined that his disabling psychological condition precludes him from maintaining full-time employment, and that there is no evidence in the record that he has the ability to learn the clerical skills necessary to attain employment in the jobs used by the Retirement Board to calculate the average salary he could potentially earn. He also contends that the Retirement Board improperly calculated his annuity because it relied on the Market Survey, where three out of the five jobs listed were available for part-time employment, with no evidence that those jobs were available for full-time placement or with the salary listed. We agree.

■ Our review of the Retirement Board's decision is "limited to ensuring that the Board (1) made findings of fact on each material, contested factual issue, (2) based those findings on substantial evidence, and (3) drew conclusions of law which followed rationally from the findings." *Beckman v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 810 A.2d 377, 384 (D.C.2002) (quoting *Britton v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 681 A.2d 1152, 1155 (D.C.1996) (other citation omitted)). Our function in reviewing agency decisions is to ascertain whether the inferences that were drawn "are within the reasonable boundaries prescribed by the facts." *Williamson v. District of Columbia Bd. of Dentistry*, 647 A.2d 389, 394 (D.C.1994). "[W]e will not hesitate to reverse a [Retirement] Board decision that is not based

on substantial evidence." *Baumgartner v. Police & Firemen's Ret. & Relief Bd.*, 527 A.2d 313, 316 (D.C.1987). Substantial evidence is "more than a mere scintilla"; it is evidence that a "reasonable mind might accept as adequate to support a conclusion." *Pierce v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 882 A.2d 199, 205 (D.C.2005) (citations omitted).

■ According to our test in *Logan v. District of Columbia Dep't of Employment Servs.*, 805 A.2d 237, 243 (D.C.2002) (citations omitted), "job availability should incorporate the answer to two substantive questions: (1) considering the claimant's age, background, etc., what can the claimant physically and mentally do following his injury, that is, what types of jobs is he capable of performing or capable of being trained to do? (2) Within this category of jobs that the claimant is reasonably capable of performing, are there jobs reasonably available in the community for which the claimant is able to compete and which he could realistically and likely secure." We have also held that a listing for a part-time position is not substantial evidence that a full-time position is available at the same rate of pay. *Bausch v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 855 A.2d 1121, 1124 (D.C.2004). The government cannot propose a part-time position with an extrapolation for full-time annual salary. *Id.* "[A]n unsupported and unpersuasive assumption regarding the convertibility of part-time positions [ ] into full-time positions is not good enough." *Id.* (internal quotation marks and citation omitted).

■ The Retirement Board erred in basing its annuity calculation on findings unsupported by substantial evidence that FF Leach was qualified to work full-time as a customer service representative, office clerk, and front desk support. The Retire-

ment Board specifically found that "*[w]ith vocational guidance*, it was agreed that [FF Leach] *might consider* vocational options such as customer service, file clerk or dispatcher ... [and FF Leach] *may be able* to perform [these jobs] based on his limitations and skill-set." There was no evidence in the record that FF Leach would be given the vocational guidance necessary to become qualified for these jobs, nor was there any evidence that the specific jobs listed would provide on-the-job training, which would allow him to be hired despite his lack of necessary qualifications. *See Shaw, supra*, 936 A.2d at 807 (holding Retirement Board did not have substantial evidence to find petitioner could work as probation clerk or social service clerk when record silent regarding on-the-job training that would allow him to be hired despite lacking necessary qualifications).

Moreover, the Retirement Board concluded that FF Leach had the physical and intellectual capacity, education/training, and experience to occupy other employment in the D.C. Metropolitan area, but did not mention his psychological condition as a limiting factor in this conclusion. The Retirement Board only noted FF Leach's psychological condition as affecting his ability to work by mentioning that Dr. Filson testified that "psychologically, there are 'some jobs [FF Leach] can do.'"

However, this statement was taken out of context, and when reviewing Dr. Filson's full answer to the question posed by the Retirement Board, it does not support a finding that FF Leach was currently capable of being gainfully employed. Dr. Filson testified that, "I think that there [are] some jobs he can do. Probably I would start him out part-time." In addition, Dr. Filson testified that FF Leach cannot be gainfully employed because the severity of his psychological disability rendered him capable of returning to work only on a part-time basis, and only in a setting where he can work in relative isolation, doing things that are not too task-demanding. Dr. Filson speculated that there are light-duty jobs FF Leach could perform one day, but he would not want FF Leach doing these tasks "right out of the box." FF Leach would need to be eased into working in this capacity, and the remission of his psychiatric symptoms would need to be monitored.[4] Since the Retirement Board did not specifically mention this testimony, nor did it make specific findings regarding FF Leach's psychological state and his ability to work despite his condition, we cannot say that the finding that FF Leach can maintain these jobs is supported by substantial evidence. *See Shaw, supra*, 936 A.2d at 806–07.

The Retirement Board also inappropriately considered two customer service po-

---

4. Dr. Filson went on to opine, by use of hypothetical:

> If [FF Leach] were to try to work in a bank, do I think that he should be a bank teller? Even if he was light duty and he could get up and walk around, also? No, absolutely not, because the potential is somebody is going to come in and rob the place, okay? And he's going to be hypervigilant and so forth. Now, could he, if he had the skills, work in the ... bank somewhere, doing some filing, bookkeeping, that sort of thing? Sure, I think that would be fine. So that's one example.
> 
> ....

> Do I think he should work in a 7–11 or a grocery store, where he's out meeting the public every day? No, I don't think that ... that's totally not where we want to go.
> 
> ....
> 
> [FF Leach's] frustration tolerance is pretty low.... And you know, he's going to get fired if somebody, you know, spills a cup of coffee here or there, and something splatters on his papers, and then he's screaming and hollering, they are going to fire him. And that will be one more failure and one more ratcheting up of his worthlessness, sense of self.

sitions and the office clerk position when reducing FF Leach's annuity because each of those jobs were temporary or summer employment. We held in *Bausch* that a listing of a part-time position is not substantial evidence that the same position at the same salary would be available as a full-time position. *Bausch, supra,* 855 A.2d at 1124. We therefore reverse the Retirement Board's determination and remand for the Retirement Board to redetermine FF Leach's annuity in a manner consistent with this opinion.[5]

### III.

■ FF Leach also challenges the Retirement Board's finding that his back injury did not occur in the performance of duty. He contends that the District failed to rebut, by substantial evidence, his claim that his back injury occurred on September 11, 2001.[6] We have articulated a burden-shifting framework to guide the Retirement Board's determination in resolving the factual issue of whether a claimant's injury has been incurred during the performance of duty. A claimant seeking benefits under D.C.Code § 5–710(a) has the "initial burden of producing evidence that the disabling injury was incurred in the performance of duty." *Pierce, supra,* 882 A.2d at 204 (quoting *Baumgartner, supra,* 527 A.2d at 315) (other citation omitted). Under the burden-shifting scheme, "when a claimant makes a showing that he or she was injured in an on-duty incident, the burden of proceeding shifts, and it is incumbent upon the government to adduce substantial evidence tending to disprove the infer-

ence that the disability resulted from on-duty injury." *Id.* (citations omitted). If the District fails to produce adequate proof to effectively rebut claimant's *prima facie* case, the claimant is "entitled ... to rely on the logical inference that his or her disability was the result of the proven on-duty injury." *Id.* at 205 (citations omitted).

FF Leach asserts that his testimony together with the orthopedic evaluation of Dr. Hughes and the occupational disability evaluation by Dr. Medley was sufficient to establish he injured his back when attempting to break bulletproof glass with his axe, by order of his lieutenant. With the exception of FF Leach's first report to the Police and Fire Clinic on September 14, 2001—where he did not report back problems—all medical documentation, including eight visits to the Police and Fire Clinic and Kaiser Permanente, cite to September 11, 2001, as the likely time of onset of the back injury. The December 29, 2002, Kaiser Permanente report appears to be the first time September 11th was documented as the cause of FF Leach's lower back pain. Dr. Hughes reported that FF Leach had no similar injuries, no motor vehicle accidents, and no prior workers' compensation claims.

The Retirement Board, in reaching its conclusion that FF Leach's back injury was not job related, cited to the testimony of Dr. Smith–Jefferies. The Retirement Board specifically found that:

Dr. Smith–Jefferies testified that the back injury more likely occurred from something other than an on duty inci-

---

**5.** "In accordance with what appears to be its normal practice of averaging [several] jobs which the retiree has the capacity to perform, the [Retirement] Board may of course substitute proper positions for the three [unsuitable] positions it previously used." *Bausch, supra,* 855 A.2d at 1125 (quoting *Long, supra,* 728 A.2d at 116 n. 4).

**6.** The District does not contend that the Retirement Board erred in finding that chronic obstructive pulmonary disease, due to smoke inhalation, Chronic Post Traumatic Stress Disorder, and Chronic Major Depressive Disorder, moderately severe without psychotic features, were incurred in the performance of duty.

dent. [ (citation omitted).] Dr. Smith–Jefferies also stated "The back injury also, the timing was a bit of an issue. I believe that when we had the initial injury, he said that he felt a pop in his back, and that's what he recounted to me later .... he did not report back pain or popping at the time he was seen in the hospital." [ (citation omitted).]

Then, the Retirement Board reached its conclusion that "the medical diagnosis of status post anterior diskectomy, L5–S1 is a non-performance of duty injury" by relying on the testimony of Dr. Smith–Jefferies. The Retirement Board did not mention any reason for discrediting FF Leach's testimony regarding his delay in reporting his back injury or its reason for discrediting Dr. Medley whose unclear report might indicate that there was evidence of a direct causation between his back pain and the September 11, 2001 incident. Specifically, Dr. Medley's report states, "there is evidence to suggest a direct causation of [FF Leach's] symptoms and clinical findings with his exposure to smoke and the physically strenuous nature of his job as a firefighter to his asthma and to his lower back pain with radiculopathy. His post traumatic syndrome appears to be related *as well* due to the unique circumstances of September 11, 2001." While Dr. Medley does not explicitly state that there is a direct causation between FF Leach's back pain and the September 11th incident, the "as well" in the second sentence suggests that Dr. Medley attributes the asthma and back pain referenced in the preceding sentence to the September 11th incident also.

This record is insufficient for us to determine whether the Retirement Board's finding, that FF Leach's back injury did not occur on the job, was supported by substantial evidence. *See Beckman, supra*, 810 A.2d at 384. The only articulated reason for the Retirement Board's decision is Dr. Smith–Jefferies's testimony that the

back injury more likely occurred from something other than an on-duty incident because "[FF Leach] did not report back pain or popping at the time he was seen in the hospital." Dr. Smith–Jefferies stated that she "would not expect [FF Leach to go pain-free until over a year later]." The Board relied solely on this testimony despite Dr. Smith–Jefferies's earlier written report which stated no such opinion, and in fact stated "Firefighter Leach injured his back while fighting a fire at the Pentagon September 11, 2001."

Certainly FF Leach's delay in reporting a back injury is an important consideration, but we are not certain, without further explication, that it amounts to "substantial evidence tending to disprove the inference that the disability resulted from [an] on-duty injury." *Pierce, supra*, 882 A.2d at 204. In *Arellano v. District of Columbia Police & Firemen's Ret. & Relief Bd.*, for example, this court rejected the Board's conclusion that a failure to report an injury again for three years after the accident and initial report meant that the petitioner was disabled other than in the performance of duty. 384 A.2d 29, 31 (D.C.1978) (reversing and remanding where the Board concluded that there was no causal link between the on-duty accident and injury because petitioner "was not immediately disabled after the accident or bothered sufficiently by back pain before [his disk ruptured three years later] to visit the clinic"). While the facts of this case may be distinguished from *Arellano* in that FF Leach did not immediately report his back injury after the accident as Arellano did, it is significant to note that a period of three years with no medical visits or reports of back pain was not considered sufficient to rebut the presumption of an on-duty injury where there was medical testimony to support the contention that such an injury could manifest itself three years after the accident. Here, the only

evidence relied upon to rebut the presumption is Dr. Smith–Jefferies's testimony that a failure to report the injury immediately after September 11th is unexpected and therefore it must have happened at some other time.[7] Dr. Smith–Jefferies's conclusion about the timing of the injury is dependent upon the assumption that FF Leach was "pain-free" and presumably injury free up until the point at which he reported the injury in December 2002. There is no evidence in the record to suggest that FF Leach was not in pain during this period other than his failure to report it, similar to the petitioner in *Arellano*. *Id.*

On the other hand, FF Leach testified and submitted evidence in the record to explain why he initially did not report his back injury. FF Leach testified that he did not report the injury, at first, because he was afraid that if the fire department found out he had a back injury, he would lose his job. He had only been at the department for a couple of months, and he "always heard if you had a bad back, you couldn't be a fireman . . . and if they found out you had a bad back, they would retire you." He further testified that he was a third generation D.C. Firefighter, that was all he ever wanted to do, and he did not want to jeopardize his career. This testimony was not expressly discredited by the Board. Nor did the Board discredit FF Leach's evidence that a 1996 medical evaluation for back pain showed there were no disc herniations present at that time. Nor was there evidence presented of any injury subsequent to September 11, 2001.

The District also contends that it did not have to rebut a *prima facie* showing because FF Leach's failure to report the injury until a year later is sufficient alone for the Retirement Board to discount entirely his account of any such occurrence. The government cites to *Croskey, Kirkwood,* and *Baumgartner* to support its claim, but none of these cases stand for the proposition that a failure to report a claim at all, or even failure to report a claim within a certain time frame bars the claim or is sufficient evidence alone to deny a claim. *See Croskey v. District of Columbia Police & Firefighters' Ret. & Relief Bd.,* 596 A.2d 988, 992 (D.C.1991) (concluding government successfully rebutted a *prima facie* showing with evidence of a pre-existing condition); *Baumgartner, supra,* 527 A.2d at 317 (reversing Retirement Board's decision because flimsy evidence by the government is insufficient to rebut claimant's *prima facie* showing); *Kirkwood v. District of Columbia Police & Firemen's Ret. & Relief Bd.,* 468 A.2d 965, 969 n. 2 (D.C.1983) (failing to report an initial injury *may* limit recoveries under an aggravation claim). The government cites no authority to support the notion that a failure to report by itself is sufficient to conclude that an injury did not occur while on duty.

■ It is clear from the record that FF Leach satisfied his initial burden of proceeding. However, absent more detailed findings by the Board we are unable to determine whether the government met its burden of rebutting the presumption that FF Leach's injury was work related.

---

7. Federal Rule of Evidence 803(4) indicates that statements describing medical history, or past or present symptoms, pain, etc., are admissible as exceptions to the hearsay rule. Fed.R.Evid. 803(4). The basis for this exception is that such statements are considered to be reliable where they reasonably pertain to diagnosis or treatment and it is in the declar-

ant's interest to disclose all necessary information to their physician in order to obtain proper treatment. Charles Tifford McCormick et al., *McCormick on Evidence* 840–41 (3d ed.1984). We have not found any cases holding that a failure to report a symptom means that it did not exist during that period.

At a minimum, the Board should reopen the record and obtain such further evidence as is necessary to clarify Dr. Medley's report as to whether she attributes FF Leach's back pain to the events of September 11th, and Dr. Smith–Jefferies's testimony as to why she thinks a failure to report any pain prior to December 2002 means FF Leach did not sustain a back injury on September 11th as he claims, and why she departs from her December 10, 2004, report which attributes the back injury to September 11th.[8] Further, the Board should clarify if and why it considers Dr. Smith–Jefferies the treating physician. And if it does not regard Dr. Smith–Jefferies as the treating physician, the Board must further specify its reasons for crediting her opinion over other physicians who examined FF Leach and appear to attribute his back injury to September 11th. Finally, the Board should make clear whether and the extent to which it credits FF Leach's testimony regarding how he sustained his back injury and the reasons he stated he failed to report his back injury immediately. Without further detailed findings, we are unable to discern whether there was substantial evidence to support the Board's conclusion that FF Leach's back injury was not related to the September 11, 2001 incident.

Accordingly, we reverse the Retirement Board's order and remand for further consideration and findings by the Board, in accordance with this opinion.

*So ordered.*

---

8. The District of Columbia Court of Appeals may reverse and remand any administrative order or decision, lawfully brought before it for review, for "such further proceedings to be had, as is just in the circumstances."

D.C.Code § 17–306 (2008); *see also Staton v. United States,* 466 A.2d 1245, 1253 (D.C.1983) ("this court has statutory authority to remand any cause or require further proceedings in the interest of justice").