Stephen D. BECKMAN, Petitioner,

v.

DISTRICT OF COLUMBIA POLICE and FIREFIGHTERS' RETIREMENT AND RELIEF BOARD, Respondent.

No. 99–AA–955.

District of Columbia Court of Appeals.

Oct. 24, 2002.

Beckman argues that he is entitled to benefits at the higher level provided for under D.C.Code § 4–616 [2] for disabilities incurred or aggravated in the performance of duty. He contends that the Board's finding that his disability is non-work-related is not supported by substantial evidence. We conclude that the Board's decision is not supported by substantial evidence; therefore, we reverse and remand to the Board for further proceedings consistent with this opinion.

James W. Pressler, Jr., Washington, DC, for petitioner.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for respondent.

Before WAGNER, Chief Judge, and FARRELL, Associate Judge, and KERN, Senior Judge.

WAGNER, Chief Judge:

Petitioner, Stephen D. Beckman, seeks review of a final decision of the District of Columbia Police and Firefighters' Retirement and Relief Board (Board) concluding that his psychological disability was not predominantly or causally related to the performance of his duties, and therefore, his benefits would be determined pursuant to D.C.Code §§ 4–607(2), –615 (1981).[1]

## I.

### A. *Factual Background*

#### (1) *Institution of Involuntary Retirement Proceedings*

On December 6, 1998, the United States Secret Service (USSS) instituted disability retirement proceedings against Beckman who had been with the USSS since 1981. Dr. Charles Filson, a licensed psychologist with Police and Fire Clinic Associates, L.L.C., submitted the recommendation that Beckman be considered for disability retirement because he was disabled due to his "Major Depression, Recurrent, Severe." [3] At the time of the report, Beckman was on antidepressant medications, sometimes in large doses, but Beckman had shown only minimal improvement according to both of his treating physicians. Dr. Filson's report indicated that Beckman had required two hospitalizations in 1997, the first due to deterioration in his mental status, and the second for an overdose of Benzodianzepines. The records showed that in March 1998, the Special Agent in

---

1. D.C.Code §§ 4–607 and –615 have been recodified, respectively, as D.C.Code §§ 5–701 and –709 (2001). For convenience, this opinion will refer to the provisions as originally codified.

2. This provision has been recodified as D.C.Code § 5–710 (2001).

3. Among Beckman's symptoms of major depression, by August 1997, according to Dr. Filson, were: "severe crying spells, marked mood instability, liability, and irritability, significant impaired judgment and impulsiveness, appetite and weight loss, middle insomnia, and chronic suicidal ideation."

charge of the Cincinnati office had petitioned for Beckman's removal based on his medical condition. Dr. Filson also mentioned a USSS medical department report by Richard J. Miller, M.D. expressing his opinion that Beckman was disabled and unable to perform his essential job functions. In October 1998, Beckman's treating psychologist filed an affidavit with the Department of Labor stating that Beckman was fully disabled due to major depression.

Dr. Filson gave Beckman a cognitive examination which showed impairment in his attention span, concentration, and short term memory, although his insight and judgment were good. Based on interviews with Beckman, his treating doctors and a review of all the records, Dr. Filson opined that "the major depression now disabling SA Beckman is a direct consequence of his performance of duties and was incurred in the line of duty." Further, Dr. Filson stated that his review of the records did not "reveal any evidence that suggests non-duty related causality, pre-existing or otherwise caused psychiatric illness, personality disorder or family neuro-psychiatric history." He also indicated in the report that there was no evidence that Beckman was malingering, faking or exaggerating his symptoms.

According to Dr. Filson's report, Beckman, who was appointed to the United States Secret Service (USSS) in 1981, developed his first symptoms of major depression in 1986, which Beckman attributed to extended separations from his family during duty assignments with the Presidential detail.[4] Dr. Filson reviewed the report of Dr. Leonard Guedalia, who saw Beckman when he was referred for a fitness for duty psychological evaluation after threatening to kill his boss and himself. Dr. Guedalia noted that Beckman had "considerable depression, abnormal reactions to crises involving significant disappointment and [ ] Beckman's inability to cope with his work related issues and family complications." Dr. Filson observed that "it is clear from the report that Dr. Guedalia considered [Beckman's] depressive reaction to be work related." Dr. Filson observed that the USSS provided no follow-up counseling or examinations on Beckman's mental status, and Beckman did not seek private treatment at that time because of fear of stigmatization and loss of his security clearance. Dr. Filson testified before the Board that Beckman should have received follow-up treatment for what he described as "a very dangerous circumstance." According to Dr. Filson's report, Beckman returned to work and continued to function with a low level of depression until 1997, and he became isolated and aloof.

### (2) Dr. Filson's Testimony

At the hearing, Dr. Filson testified that Beckman's condition had deteriorated quickly once assigned to the Violent Crimes Task Force. He testified that the records showed that Beckman "was a high functioning person before." The depression began accelerating towards the end of 1996, and got progressively worse until August 1997, when Beckman became suicidal and first sought treatment with Dr. Baum. Dr. Filson stated that Beckman's condition had improved with various medications since he originally saw him, but that his long-term prognosis for possible

---

4. Beckman worked in Cincinnati, Ohio until November 1982, when he transferred to the Cleveland field office where he remained until June 1984. In June, 1984, he was transferred to the Protective Division for former President Gerald Ford where he worked until 1987. From 1987 to February of 1990, he was assigned to the Protective Division for President Ronald Reagan.

remission of his major depression was fair to poor. He expressed the opinion that the prognosis for Beckman's return to work as a special agent was extremely poor, although with an aggressive "psychopharmacologic" regimen and therapy, he might be able to return to work in a different occupation.

Further, Dr. Filson testified that as to Beckman's depressive symptoms, "in 1988, there was a clearly duty-related episode,"which occurred after the extended duty on the Presidential detail and the threatening incident. He noted that the patient reported a low level of depression from 1987 to 1997, but he continued to function. Dr. Filson agreed with Beckman's treating physician, Dr. Baum, that Beckman's condition destabilized with the work with the Violent Crimes Task Force. He said that Dr. Baum was of the opinion that extra-marital affairs were secondary to the work stresses, and that part of the reason that Beckman got into that type of situation was because of his already destabilized mood. In responding to the Board's questions concerning whether the affairs might be the cause, Dr. Filson responded that he had no reason to discredit Dr. Baum's opinion. In response to a Board member's question concerning Beckman's candor in disclosing the source of his problems, Dr. Filson explained that Beckman had admitted the affairs. Further, he testified that tests administered to Beckman, while not polygraphs, did give "a measure of degree of distortion by the individual of what they are presenting with in the interview and in the testing." From these tests, Dr. Filson concluded that Beckman did not have patterns of "faking, malingering, and grossly exaggerating his symptoms." Based on information provid-

ed and the opinion of his treating physicians, Dr. Filson testified that, in his opinion, the cause of Beckman's condition was related to the performance of his duties. He confirmed in testimony that Dr. Guedalia found that Beckman was depressed and that it was work-related, but Dr. Guedalia deferred to the agency on whether he was fit for duty. Dr. Filson opined that this should have been followed up in 1988 because without treatment, there was a great chance for recurrence. Dr. Filson testified that, to a reasonable degree of medical certainty, based on his evaluation of Beckman, consultation with his treating physician, and review of the records and documents, the marital episodes were secondary to the performance of duty which caused his condition. Further, Dr. Filson testified that, having reviewed new material presented to him on the morning of the hearing concerning Beckman's extra marital affairs, he saw nothing to controvert Dr. Baum's position.[5]

### (3) Beckman's Testimony

Beckman testified at the hearing before the Board that in August 1988, after returning from a two week travel assignment with President Reagan, he was informed that he would be assigned for a month in Santa Barbara, California on a Presidential detail. He became upset because such assignments were customarily for only two weeks, and he was just returning home after two weeks away. He failed to appear for work the next day because he "wanted to stay with [his] family," and as a result, he was given a one-day suspension and relieved of the Santa Barbara assignment. Beckman testified that after the disciplinary action, he made what he described as an "unfortunate remark" to a colleague, which he thought would not be

---

**5.** The reports detailed an investigation into an office affair which went awry. The other party to the affair, according to the report was shown to be deceptive in a polygraph test, which Dr. Filson pointed out during his testimony.

disclosed. He said to his colleague that he had done something wrong and "might as well just go into the boss's office and shoot it up and then just take care of myself also." Because of these threatening remarks, Beckman was ordered to undergo a fitness for duty psychological evaluation by Dr. Guedalia, which Dr. Filson mentioned in his report. Beckman did not receive any follow-up treatment with respect to the incident or the diagnosis by Dr. Guedalia.

In the summer of 1996, Beckman was assigned to the Olympics in Atlanta as an intelligence team coordinator. While he was off duty at a club next to the Olympic site at Centennial Park, a bomb exploded, and Beckman went over to try to assist one of the victims. According to Dr. Filson's report, one of the women Beckman tried to assist had been decapitated. He and several other state agents interviewed witnesses through the night until he was relieved at 6:00 a.m. the next morning. Although he had not slept in thirty-four hours, he resumed his regular work schedule the next day.

In November of 1996, Beckman volunteered for an assignment to the Violent Crimes Task Force in Cincinnati, Ohio, which would not require travel. He testified that this assignment was more stressful, since he was concurrently assigned to the field office which still required travel. He acted as firearms and physical fitness coordinator, and his duties with the Task Force required that he find and arrest fugitives and other individuals wanted for the commission of violent crimes. He was on call around the clock.

#### (4) *Testimony of Charles Brady*

Charles Brady, a special agent in charge of the Field Office in Cincinnati, testified at the hearing. He read, in part, from a report of an investigation into an incident arising out of a relationship that Beckman had with another USSS agent. Brady confirmed that Beckman was assigned to the Ford detail in 1986, and to the Presidential detail in April 1987. He pointed out that the claim that Beckman experienced problems due to separations from family in 1986 conflicted with his claim form on which he reported that the first incident of mental incapacitation was August 1988.

Brady testified that he received a call alleging that a female special agent had left threatening telephone messages on the caller's home answering machine. He said that this female agent admitted to a personal, romantic relationship with Beckman which she had ended. According to Brady, the agent reported that Beckman had struck her across the back of the head. Brady recounted that in November 1997, the Office of Inspection of USSS opened an investigation into the allegations of stalking by the female special agent. According to Brady, the relationship had been going on since December 1994, and the female agent ended it on September 3, 1996. In July 1997, the agent and Beckman had a confrontation in the office because she had called his wife. Brady also acknowledged that the report showed that this agent was deceptive on two polygraphs tests.

Finally, Brady confirmed Beckman's dual function with the Task Force and protective intelligence cases and advance. Brady said that Beckman was not used on the Violent Crimes Task Force often until after the inauguration in January 1997. He described Beckman's duties consistently with Beckman's testimony.

#### B. *The Board's Decision*

The Board determined, based upon a preponderance of the evidence, that Beckman "is disabled due to a major depres-

sion, with a functional impairment of 50 per cent" and that "his disability has rendered him incapable of performing useful and efficient service in the assigned duties of the United States Secret Service, pursuant to D.C.Code § 4–607(2)(1981)." However, the Board found that Beckman's psychiatric symptoms were not incurred in or aggravated by the performance of his duties pursuant to D.C.Code §§ 4–615, –616. The Board reasoned that

> [Beckman] has not sustained his burden of proving that his psychological symptoms developed from a specific incident or that they were predominantly or causally related to the performance of his duties and responsibilities as a special agent. The record shows that [Beckman] was unable to deal with and balance the normal stresses of his position as special agent with his personal responsibilities and family issues.

The Board concluded that Beckman had failed to show that his duties as a special agent were uncommon or unusual as compared to the responsibilities of other special agents. It found significant the absence of a specific incident occurring between 1986, the date on which Dr. Filson stated that Beckman began to develop symptoms of depression, and 1988, when Dr. Filson said that Beckman's depression escalated while on a Presidential detail. The Board also found that the 1988 threats incident was not related to Beckman's duties, but was simply an emotional reaction to the administrative sanctions imposed for his conduct. The Board found significant that Beckman did not seek and was not given treatment following this incident until he saw Dr. Baum in 1997, and that Beckman did not report any psychiatric or physical conditions in answer to questionnaires completed for his job in January 1989 and December 1989. Beckman performed his duties with distinction, according to the Board's findings.

The Board dismissed Dr. Filson's opinion that Beckman became depressed over his separation from his family and obsessed with the dangerous aspects of his work with the comment that these "issues involved administrative aspects of his job and personal and family concerns." Therefore, the Board concluded that Beckman had failed to show that his symptoms were due to anything more than the "inner workings of his personality." It found that Beckman failed to show that his duties on the Violent Crime Task Force or during his career were uncommon or unusual as compared to other special agents. It rejected the theory of aggravation of a preexisting condition because Dr. Filson had stated that the records did not show any pre-existing psychiatric illness or personality disorder prior to August 1997. Further, the Board found that

> the factors [Beckman] cites as causing his mental condition, i.e., duty assignments, leave status and separation from family, are external and tenuously related to his duties and responsibilities as a special agent and are not contemplated by the statutes as causal factors of duty-related aggravation.

## II.

Beckman argues that he met his initial burden of proving that his disability was incurred in the performance of duty, thereby shifting the burden of proffering substantial and persuasive evidence that the disability was not incurred in the performance of his duties. He contends that the government failed to meet that burden. The Board argues that contrary to Beckman's argument, the standard of review is not whether the Board's findings were based on "preponderate, substantial and persuasive evidence," but whether the

Board's decision is supported by substantial evidence in the record. It contends that substantial evidence supports the Board's findings. We review first the legal principles which guide our decision and then consider the parties' respective arguments in light of them.

### A. Standard of Review and Applicable Legal Principles

This court's review of administrative decisions of the Board "is limited to ensuring that the Board (1) made findings of fact on each material, contested factual issue, (2) based those findings on substantial evidence, and (3) drew conclusions of law which followed rationally from the findings." *Britton v. District of Columbia Police & Firefighters' Retirement Bd.*, 681 A.2d 1152, 1155 (D.C.1996) (citing *DiVincenzo v. District of Columbia Police & Firefighters Retirement & Relief Bd.*, 620 A.2d 868, 872 (D.C.1993); *Allen v. District of Columbia Police & Firefighters' Retirement & Relief Bd.*, 528 A.2d 1225, 1229 (D.C.1987)). If supported by substantial evidence, we must accept the agency's factual findings, even if we might have reached a different result if acting as fact finder. *Id.* at 1154 (citation omitted); *Dowd v. District of Columbia Police & Firefighters' Retirement & Relief Bd.*, 485 A.2d 212, 215 (D.C.1984) (citations omitted). In applying the substantial evidence test, "[w]e may not substitute our judgment for that of the Board." *Britton, supra,* 681 A.2d at 1154 (citation omitted).

A member of the United States Secret Service may recover benefits under the more generous provisions of D.C.Code § 4–616(b) by proving that the disabling injury or disease was incurred in the performance of duty or aggravated by the performance of duty. Under this provision, benefits are available even where the proximate cause of the disease is doubtful or not related to the performance of duty, provided it "is shown to have been aggravated by the performance of duty to such an extent that the member is permanently disabled for the performance of duty...." D.C.Code § 4–616(b).[6] In that event, the condition is "construed to have been incurred in the performance of duty." *Id.* This provision covers disabling psychological conditions incurred in the performance of duty. *See Allen, supra,* 528 A.2d at 1230

If a claimant makes a showing of an injury incurred in the line of duty, the opposing side must then offer evidence disproving the logical inference that the ensuing disability was the long term result of such injury. *Baumgartner v. Police & Firemen's Retirement & Relief Bd.*, 527 A.2d 313, 315 (D.C.1987) (citing *Johnson v. Board of Appeals & Review*, 282 A.2d 566, 570 (D.C.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1175, 31 L.Ed.2d 232 (1972) (other citations omitted)). Put another way, "once the claimant makes a showing of a disabling on-duty injury, the burden shifts to the government, which must then rebut this 'logical inference' with 'substantial evidence ... disprov[ing] the inference of causation by an on-duty injury....'" Id. (citing *Arellano v. District of Columbia Police & Firemen's Retirement & Relief Bd.*, 384 A.2d 29, 30 (D.C.1978)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as ade-

---

6. As originally codified, this provision allowing benefits for the aggravation of injuries or diseases not incurred originally in the performance of duty was available to all eligible law enforcement personnel. *See* D.C.Code § 4–527(2)(1973). However, when the section was recodified, only members of the enumerated services, which includes the United States Secret Service, were allowed to recover for the aggravation of off-duty injuries or diseases, consistent with the requirements of the statute. *See* D.C.Code § 4–416(b).

quate to support a conclusion." *Croskey v. District of Columbia Police & Firemen's Retirement & Relief Bd., supra,* 596 A.2d 988, 990 (D.C.1991) (citation and internal quotation marks omitted). The ultimate burden of persuasion, however, remains with the claimant. *Id.* at 991–92.

## B. *Discussion*

 The controversy here centers on whether Beckman's disabling mental illness was a direct consequence of his duties as a Secret Service officer. Beckman argues that all the medical experts rendered opinions that his depressive reaction in 1988 was related to the performance of his duties. He contends that there is no evidence of any pre-existing condition and that considering the unanimous opinions of the medical experts as to causation, the Board erred in its ruling. The Board argues that there was ample evidence supporting findings and conclusions to the contrary, and therefore, its decision should be upheld.

First, we agree that Beckman met his initial burden of showing that his disabling condition was incurred in the performance of duty. *See Baumgartner, supra,* 527 A.2d at 315. Beckman's testimony and all of the expert testimony and doctors' reports support this finding and conclusion. To summarize briefly, in a Retirement Report prepared on December 6, 1998, after recounting Beckman's work history leading

to Beckman's disabling condition, Dr. Filson expressed the opinion that "the major depression now disabling SA Beckman is a direct consequence of his performance of duties and was incurred in the line of duty." [7] Dr. Filson testified that Beckman's assignment to the Violent Crimes Task Force precipitated a recurrence of Beckman's disabling mental illness. His written report was consistent, expressing the opinion that "[t]he recurrence of [Beckman's] major depression occurred in mid–1997 following his having been assigned to an inter-Agency task force for the arrest of violent criminals." Further, Dr. Filson stated that Beckman was depressed and despondent over his separation from his family and was affected by the danger involved in working in the Violent Crimes Task Force. Dr. Filson concluded that "this is the same type of slow onset and family related concerns due to duty assignment that precipitated his homicide-suicide threat of 1987[sic]." It was also the opinion of Beckman's treating psychologist that Beckman's final breakdown in 1997 was the direct result of accumulated stress and depression from his employment with the Secret Service. There was evidence that Dr. Guedalia, who performed a fitness for duty evaluation of Beckman in 1988, determined that Beckman was suffering from considerable depression, abnormal reactions to crises involving disappointment and an inability to

---

7. In the report, Dr. Filson recounts that in late 1986, Beckman "developed his first symptoms of major depression which was attributed to very extended separations from his family due to his duty assignments with the Presidential detail[,]" and that "his mood appeared worsened by the shift rotations which he was required to work." He outlined the travel detail and immediate assignment to Santa Barbara, without an opportunity for family visits which precipitated his homicidal and suicidal threats and psychological evaluation by Dr. Guedalia. Dr. Filson noted a

"low level of dysthymia with intermittent irritability" between 1987 to 1997. He described events at the 1996 Olympic bombing when Beckman went to the assistance of victims of the bombing, and attempted "medical assistance of the deceased (decapitated) female victim." This was apparently followed by Beckman's five-week detail away from his family. By August, 1997, according to Dr. Filson, Beckman "manifested a full set of symptoms consistent with major depression," which he described in some detail.

cope with his work related issues and family complications. Dr. Filson stated that a review of Dr. Guedalia's report made clear that he considered Beckman's depressive reaction to be work related.

There was no evidence that Beckman suffered a pre-existing psychological illness. Both Dr. Baum and Dr. Filson concluded that Beckman's extramarital relationship did not cause his disabling condition and was only secondary to the stresses related to performance of his job responsibilities. Based on the evidence presented, Beckman clearly met his burden or proving he was injured in the line of duty. Therefore, the burden shifted to the government to present substantial evidence to rebut the "logical inference" that Beckman's disabling condition resulted from the on-duty injury. *Britton, supra,* 681 A.2d at 1155 (citing *Baumgartner, supra,* 527 A.2d at 315) (other citation omitted).

■ In reaching its decision, the Board rejected the unanimous expert opinions which concluded that the onset of Beckman's depressive symptoms occurred as a result of the 1988 incident. The Board determined that there was "no specific incident of injury that caused Beckman's symptoms to develop, but his condition resulted from his personality and inability to cope with the balance between life and work issues." However, there was no medical or other expert opinion evidence to support the Board's finding that Beckman's disability was caused from his particular personality traits rather than from work-related stresses and conditions, as the expert opinions concluded. We recognize that the determination of whether an injury or disabling condition was incurred in the performance of duty is a factual question; however, a finding on this issue

will be upheld only if supported by substantial evidence. *See Croskey, supra,* 596 A.2d at 990 (citing *Kirkwood v. District of Columbia Police & Firemen's Retirement & Relief Bd.,* 468 A.2d 965, 967 (D.C. 1983)). Here, a review of the record shows a lack of substantial supporting evidence for the Board's decision.

A major flaw in the Board's factual finding on the question of the proximate cause of the psychological disability in this case is that it is not a matter within the ken of the average layperson. Determining the root cause of a psychological condition and ruling out other possible causes are questions better elucidated by expert opinion. Here, the Board rejected the undisputed expert opinions presented and essentially resolved not only the question of cause, but the issue of primary cause of Beckman's psychological condition, based upon its own opinion of the impact of on-the-job and non-job-related circumstances in Beckman's life on his mental faculties. In this case, we conclude that this was error.

■ In evaluating evidence, an agency must take into account the testimony of a treating physician, which is preferred ordinarily over that of a physician retained solely for the litigation. *White v. District of Columbia Dep't of Employment Servs.,* 793 A.2d 1255, 1258 (D.C.2002). Where there are conflicting medical opinions, the fact finder in an agency case may reject the treating physician's opinion in favor of the opinion of another physician. *Id.* at 1258 (citing *Canlas v. District of Columbia Dep't of Employment Servs.,* 723 A.2d 1210, 1212 (D.C.1999)). However, if it does so, the agency must provide reasons for rejecting the opinion of the treating physician.[8] *Id.* (citing *Clark v. District of Columbia Dep't of Employment Servs.,*

8. We see no reason to establish a different requirement for consideration of a treating

psychologist who qualifies as an expert witness before the Board.

772 A.2d 198, 203 (D.C.2001) (other citation omitted)). While the treating psychologist did not testify in this case, his expert opinion was included in the record before the Board. Reports of doctors who examined the claimant and have reached a diagnosis and expert opinion in their field of expertise constitute substantial evidence for consideration by the Board. *Croskey, supra,* 596 A.2d at 991 n. 4 (citing *Dowd v. supra,* 485 A.2d at 215). In this case, the expert psychologist who did testify, Dr. Filson, rendered an opinion consistent with that of the treating psychologist that the cause of Beckman's condition was job-related. Under the circumstances, the Board must make a careful analysis and provide reasons for rejecting the opinion of the expert as to causation. *See White, supra,* 793 A.2d at 1258; *see also Stoner v. District of Columbia Police & Firemen's Retirement & Relief Bd.,* 368 A.2d 524, 529 (D.C.1977). There must be some reasoned basis supported by substantial evidence for its rejection of the unanimous opinions of such experts. *See Croskey, supra,* 596 A.2d at 990 (citation omitted).

Upon a review of the record, we find no substantial support for the Board's rejection of the experts' opinions and conclusion that Beckman's disabling condition was caused by non-work-related circumstances. First, there is no expert evidence to rebut the considerable expert opinions presented supporting Beckman's claim. There is no evidentiary support for its conclusions that the cause of Beckman's 1988 symptoms were proximately related to his emotional reactions to supervisory authority, rather than to the job stresses identified by Dr. Guedalia and Dr. Filson. Second, this is not a case where the evidence shows that Beckman's psychological difficulties predated his employment with the Secret Service. *Compare Kirkwood, supra,* 468 A.2d at 968 (denying § 4–416 benefits where petitioner's psychological condition was rooted in experiences predating employment). In fact, the record showed that Beckman was successful academically in high school and college, was elected to leadership roles, and worked for suburban police departments before his appointment to the Secret Service. Dr. Baum reported that "[n]ot until an incident [in] 1988 does one perceive the impact that [Beckman's] career as a Secret Service Agent is having on his personal and family life." This is some seven years after Beckman entered the Secret Service and many years before the extra-marital affair to which the Board attributed Beckman's mental difficulties. Both Dr. Baum and Dr. Filson opined that the lack of follow-up treatment left Beckman vulnerable to the intense stressors that led to his disability in 1997 and 1998.

 The Board reasoned that Beckman failed to show that the stressful duties he encountered were different than those faced by any other agents. The statute in question makes no distinction between an officer's characteristics and vulnerabilities as compared with other officers. *See Stoner, supra,* 368 A.2d at 529. "The mere fact that one officer may be more susceptible to disabling injury than another cannot be treated as dispositive without careful analysis of circumstances or events which caused the asserted propensity to manifest itself in a disabling condition." *Id.* This analysis must still center on "whether the circumstances which caused the vulnerability to ripen into disability were a part of or external to the officer's service activities." *Id.* The analysis is further complicated by the fact that nonorganic impairments of the type which concededly resulted in Beckman's disability, frequently may have "a broad range of causative factors, both subtle and obvious, some of which are related to the officer's service and some of which are not." *Morgan v. District of Columbia Po-*

388

*lice & Firemen's Retirement & Relief Bd.,* 370 A.2d 1322, 1325 (D.C.1977). The causative factors were identified by the experts and rejected by the Board in favor of its own opinion that an external cause, an extra marital affair and its aftermath, was the primary cause of Beckman's major depression. The Board did not reject the experts' opinions as to causation as incredible. It simply reached a different opinion based upon facts which it found to be significant. "Where there is credible expert evidence establishing that both internal and external circumstances medically contributed to the ultimately disabling condition, the Retirement Board is obligated to consider all the relevant factors, determine their relationship to each other, and if possible, evaluate their relative causative significance." *Id.* It is difficult to see how the Board could properly meet this obligation where all of the expert evidence establishes the primary cause as job-related without contrary expert evidence to aid in its determination. Under the circumstances, we conclude that the Board's decision is not supported by substantial evidence. Further, we conclude that Beckman met his ultimate burden of persuasion that his disabling condition was predominately caused by, and subsequently aggravated by, his duties as a Secret Service agent.

For the foregoing reasons, we reverse the decision of the Board, and remand to the Board for further proceedings consistent with this opinion.

*Reversed and Remanded.*