Eric A. ADGERSON, Petitioner,

v.

POLICE & FIREFIGHTERS' RETIREMENT AND RELIEF BOARD, Respondent.

No. 12–AA–357.

District of Columbia Court of Appeals.

Argued April 9, 2013.
Decided Aug. 15, 2013.

Anthony M. Conti, with whom Daniel J. McCartin, Baltimore, MD, was on the brief, for appellant.

Richard S. Love, Senior Assistant Attorney General, with whom Irvin B. Nathan, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murkasky, Deputy Solicitor General, were on the brief, for appellee.

Before OBERLY and BECKWITH, Associate Judges, and FERREN, Senior Judge.

BECKWITH, Associate Judge:

Petitioner Eric Adgerson, a Metropolitan Police Department officer, fully recovered from surgery fusing four of the seven vertebrae in his neck. Yet he was forced to retire from the department with a disability annuity because of what the Police and Firefighters' Retirement and Relief Board deemed an "unacceptable risk" that a blow to his newly inflexible neck while on duty would paralyze him and endanger the public.

His petition asks us to find that the Board erred in determining that his post-surgical condition permanently disabled him from duty as a police officer despite a Police and Fire Clinic doctor's testimony that he could do all the physical tasks required in his work. We conclude that the Board's decision—factoring this future risk to Officer Adgerson and the public into its determination whether he could perform the full range of duties of a member of the department—involved a reasonable interpretation of an ambiguous statutory scheme and was based on substantial evidence in the record. We thus affirm the Board's determination on this issue as well as the others raised in Adgerson's petition.

## I. Background

After a car accident in early 2009, Officer Adgerson underwent three-level cervical spinal fusion surgery[1] in September 2010 and began a slow road to recovery from pain and limited mobility in his neck. In addition to seeing his own surgeon, Adgerson visited the Police and Fire Clinic, where the clinic's medical director, Dr. Olusola Malomo, examined him and his progress. Dr. Malomo recommended in February 2011 that Adgerson be placed on disability retirement because, she said, he was "unable to perform the full duties" of an MPD officer "due to the nature of his surgery and permanent physical activity restrictions imposed by his surgeon which prohibit repetitive neck bending, overhead activities, and patrol duties." By the time of his Retirement Board hearing more than ten months later, however, Adgerson no longer complained of pain and another clinic examiner had determined that he had good range of motion in his neck.

At the Board hearing to assess whether Officer Adgerson could return to full duty, Dr. Malomo repeated her recommendation that he be put on disability retirement,[2] while Adgerson opposed the recommenda-

---

1. In the procedure, a surgeon removed the three cushion-like discs between four adjacent vertebrae in his neck. To stabilize the neck, the doctor fused the four bones with a metal plate.

2. Dr. Malomo acknowledged that she could not find in the record any medical forms from the surgeon, Dr. John Ergener, permanently restricting Officer Adgerson's activities. She also acknowledged that even though she had said in February that Adgerson had reached "maximum medical improvement" at that time "because the member had surgery on September 21, 2010 and his symptoms had remained stable over a period of several months," he had since improved. But, she said, her February assessment was "still accurate" because "MMI is the best medical judgment at that point in time to determine if ... the member's condition is stable and steady, given [that with] the nature of medical conditions and the human body, most conditions either get worse or get better with time."

tion, citing his recovery. While acknowledging the officer's apparent progress since her February evaluation, Dr. Malomo said that because of the fused bones in his neck, he could not perform "[a]ny duties that will ... endanger [him because of a] physical altercation with a suspect, with a citizen, working with prisoners, on patrol.... I think it would not be safe for him to perform those duties." The doctor told the Board that "the fact that there is a triple fusion" did not negatively affect "the regular duty that he is required to perform as a police officer," but she explained in detail how the surgery had made his neck less able to safely bend and absorb impact. Because a majority of the vertebrae in his neck could no longer move independently, she said, whiplash from a car crash or an attack by a suspect resisting arrest could seriously injure his spine or paralyze him.

As the Board inquired into her recommendation, Dr. Malomo testified that triple fusion is "more extensive surgery compared to what most people have" and that sports medicine doctors, citing studies of athletes, recommend that people with three-level fusions stop participating in contact sports. Though she could not put a percentage to the risk Officer Adgerson would face if he returned to duty, the doctor said that neck injury is "one of the more common injuries" to police officers [3] and that "[a]ny altercation that involves the neck would lead to harm" to Adgerson. Dr. Malomo said her decision that the officer could not safely return to duty was based on "the severity of the outcome."

She would "not be as concerned," she said, "[i]f it was just a minor ... neck pain that they would suffer or minor strain as a result ... but if it would lead to paralysis ... that's why."

Officer Adgerson insisted that he could return to full duty, and he said his doctor agreed. He told the Board that his pain was gone, and that he could fully turn his neck, drive without restrictions, run, jump, and do repairs around the house. He could, he said, "perform all the duties of a police officer." The surgeon who performed his surgery, Dr. John Ergener, did not testify at the hearing, but the evidence admitted included a memo Dr. Ergener wrote after speaking with Dr. Malomo, in which he said, "I explained that a year out from surgery there are no significant symptoms about the neck or arms ... [and] I felt a return to work with a trial of full duty is justified." [4]

Dr. Ergener's opinion was not unequivocal, however. In the memo of his conversation with Dr. Malomo, he said he noted the "concern about [Officer Adgerson's] ability to do full duty" and told Dr. Malomo he strongly suggested that Adgerson have an independent medical examination. Dr. Malomo added, in her Board testimony, that Dr. Ergener told her the fusion was strong but that he could not comment on the segments above and below the metal plate, the locations that after surgery would receive the brunt of any impact to the neck and head. Dr. Ergener, she said, "wasn't very familiar with return to work

---

3. Dr. Malomo did not have any statistics to support her claim about the frequency of neck injuries among officers but said that "based on my time in the clinic ... [i]t's a very common injury." The neck is "the most unprotected part of [an officer's] body," she said, so it is often a target for people who want to harm officers.

4. The record also contains an October 2011 note from Dr. Ergener entitled "Verification of Treatment," in which the doctor wrote that Officer Adgerson's "cervical spine is structurally stable and range of motion has improved since last visit and there has not been any significant pain." Here, Dr. Ergener did not mention a "trial of full duty" but instead wrote, "I feel a return to work at full duty is justified."

evaluations, and said . . . we should get an independent evaluation."

The Board found that Officer Adgerson was "incapacitated from further duty with the Department by reason of a disability not incurred in the performance of duty," and ordered that he be retired on an annuity calculated according to statute. In its order, the Board wrote:

> [T]here is substantial evidence in the record that the Member (Adgerson) cannot safely perform the duties of a MPD member as a result of his three-level spinal fusion. The Board is convinced by the testimony of Dr. Malomo that the inflexibility of the fused vertebrae in the Member's cervical spine would result in unacceptable risk to the Member and to the public in the event he was to suffer blows to the head and neck while subduing a suspect or suffer injury to his head and spine as a result of performing high-speed maneuvers such as would be required in a high-speed chase.

Although Board members found that Adgerson had no residual symptoms after his surgery and that he had a full range of motion and physical abilities, they identified "the sole issue [as] whether there is a safety risk to the Member, his partner, or the public."

The Board acknowledged Dr. Ergener's opinion but said it was not an "unequivocal recommendation" that Officer Adgerson could perform the full range of duties required of an officer. Meanwhile, the Board wrote that as Dr. Malomo was board-certified in occupational medicine and familiar with the severity and types of injuries that members sustain, it "afford[ed] great weight to her concerns about the risk to the public if an officer is allowed to serve with a three-level cervical fusion." The Board thus found that Adgerson was "unable to perform the full duties of a member of his department."

## II. Analysis

■ Officer Adgerson claims the Board applied an erroneous legal standard because "[r]isk of future injury has no bearing on the Retirement Board's determination whether to retire a police officer on disability." He also argues that the Board's decision was not based on substantial evidence. Our overall review of the Board's decision is limited, and "we must affirm an agency's ruling unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Rife v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 940 A.2d 964, 965 (D.C.2007) (citations omitted). We do not "rubber stamp" agency decisions, however, and we must determine "whether the Board failed to (1) state findings of fact on each material, contested factual issue, (2) base such findings on substantial evidence, or (3) draw conclusions of law which follow rationally from the findings." *DiVincenzo v. District of Columbia Police & Firefighters Ret. & Relief Bd.*, 620 A.2d 868, 872 (D.C.1993).

### A. Statutory Interpretation

■ Officer Adgerson argues the Board applied "the wrong evidentiary standard" to his case, but his claim is essentially one of statutory interpretation. While our review of the Board's construction of the D.C. Police and Firefighters' Retirement and Disability Act, D.C.Code § 5–701 *et seq.*, is *de novo*, "[o]rdinarily, we have good reason to respect an administrative agency or board's informed interpretation of the statute it administers, and we will defer to it as long as that interpretation is reasonable and not plainly wrong or inconsistent with the statute's legislative purpose." *O'Rourke v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 46 A.3d 378, 383 (D.C.2012) (brackets and internal quotation marks omitted); *see also id.* at 392 (Schwelb, J., concurring) (citing *Chevron, U.S.A. v. Natural Res. Def. Council,*

*Inc.*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

In construing a statute, we look first to its text, and if the language is "clear and unambiguous, we must give effect to its plain meaning." *Id.* We cannot always stop there, however, "for the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but also by considering the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* (brackets and internal quotation marks omitted). Examining this context includes "consideration of [the] entire enactment against the backdrop of its policies and objective," *id.* at 384, as well as a review of the statute's legislative history. *See Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C.1983) ("[E]ven where the words of a statute have a 'superficial clarity,' a review of the legislative history or an in-depth consideration of alternative constructions that could be ascribed to statutory language may reveal ambiguities that the court must resolve." (citation omitted)).

Officer Adgerson urges us to hold that the Board's consideration of what he calls "a speculative risk of future injury" goes against the plain meaning of the statute, as the only question the Board confronts in a disability determination, in his view, is whether the officer can physically perform the full range of duties of a police officer. He cites D.C.Code § 5–709(c), which instructs the Board that when it receives a recommendation from the department that an officer is disabled and should be retired—as opposed to an application for retirement from the officer himself—the Board:

> Shall make a disability assessment, and if the member is unable to perform the full range of duties, shall retire the member as disabled regardless of whether the member is performing useful and efficient services that are less than the full range of duties.[5]

On appeal, the Board says it is entitled to its reasonable interpretation of a different section of the Retirement and Disability Act that defines the term "disability": D.C.Code § 5–701(2). That section states: " 'disabled' and 'disability' mean disabled for useful and efficient service in the grade or class of position last occupied by the member by reason of disease or injury...." D.C.Code § 5–701(2). The Board argues that the term "useful and efficient service" accommodates its conclusion that it may consider, when making a disability assessment, future risk of harm to the officer, other officers, or the public.

We do not think either of these constructions adequately captures the way the various parts of the statute interact. Each party accuses the other of not giving effect to the plain meaning of the section it cites—the "useful and efficient service" standard for the Board and, for Officer Adgerson, the "perform the full range of duties" standard. But neither party grapples with the fact that the Board is tasked with applying *both* sections. When the Board acts based on a department's retirement recommendation under § 5–709(c), its role is still to conduct a "disability assessment" and so it would of course turn to § 5–701(2) for the definition of "disabili-

---

5. The term "full range of duties" is defined in D.C.Code § 5–701(19) as:

> The ability of a sworn member of the Metropolitan Police Department or the Fire and Emergency Medical Services Department to perform all of the essential functions of police work or fire suppression as determined by the established policies and procedures of the Metropolitan Police Department or the Fire and Emergency Medical Service's Department and to meet the physical examination and physical agility standards established under §§ 5–107.02 and 5–451.

ty." The agency thus must deal with the ambiguity this potential conflict inevitably creates. *See In re T.L.J.*, 413 A.2d 154, 158 (D.C.1980) (It is a "well-accepted tenet of statutory construction that, whenever possible, a statute should be interpreted as a harmonious whole." (internal quotation marks omitted)).

Nor do we believe that the parties on appeal accurately read the Board's decision in the first place. In its order, the Board sought to answer this question: "Is the Member disabled from performing useful and efficient service with the Department pursuant to D.C.Code §§ 5–701(2) and 5–701(19) ...?" This formulation of the question, which includes citations to the definitions of "disabled" *and* "full range of duties," shows the Board recognized the competing standards and sought to work within that context. The Board's final conclusion—that Adgerson was "unable to perform the full duties of a member of his department"—demonstrates, moreover, that it ultimately was concerned with the question of performance, not of useful and efficient service.

A review of the legislative history of D.C.Code § 5–709(c) reveals why these two sections seem at odds. The D.C. Council added subsection (c) to § 5–709 in 2004 following this court's decision in *Alex-*

*ander v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 783 A.2d 155 (D.C.2001). In that case, the fire department sought to retire a firefighter as part of "a concerted effort to retire all firefighters who are unable to perform firefighting duties because of a disability, so as to free up more positions for active firefighters." 783 A.2d at 157. The court, which in cases before *Alexander* had outlined what an individual officer or firefighter had to prove under D.C.Code § 5–701(2) (the definition of "disabled") when seeking his or her *own* disability retirement, now expanded that burden to the situation before it, where instead the department sought the involuntary retirement of one of its members.[6] *See id.* at 158.

After *Alexander*, the police and fire departments could not involuntarily retire a member who because of a disability could not perform regular duties, as long as the member was performing "useful and efficient service" in the same pay grade and class. This result evidently troubled the departments, which, as alluded to in the facts of *Alexander*, were seeking at that time to free up their ranks by moving partially disabled members out of "limited duty"[7] jobs when it was obvious they could "no longer perform all essential tasks that comprise the basic police officer [or fire-

6. In *Alexander*, we stated that "[i]n the majority of our cases dealing with disability retirement, it is the employee who seeks retirement and the employer who opposes such an action. In such cases, we have held that the burden is on the employee to demonstrate that he or she is unable to perform useful and efficient service." 783 A.2d at 158. In those previous cases, we had consistently interpreted the "useful and efficient service" standard in D.C.Code § 5–701(2) to mean that an officer or firefighter seeking his or her own disability retirement must prove not only that the disability prevented the performance of his or her old job but also that "there is no job available which he can perform in the grade or class of position he last occupied." *DiVin-*

*cenzo*, 620 A.2d at 871. To be consistent, the court in *Alexander* applied this burden to the police and fire departments, holding that because the department recommended Alexander's retirement, it "must not only show that Alexander is disabled for useful and efficient service as a firefighter but must also show that there are no other positions in the Department in the grade or class of position that Alexander last occupied for which he can provide useful and efficient service." 783 A.2d at 158.

7. Limited duty is "a temporary status for members who, because of injury or other temporary medical disability, are not able to perform the full range of duties, but are certified

fighter] position." *See* App. to Pet'r's Br. 409 ("Updated Analysis of Useful and Efficient Service": Memorandum from then-MPD Chief Charles H. Ramsey to the Board, February 2004).

These concerns were addressed in sections of D.C. Law 15–194, an omnibus public safety law with which lawmakers aimed to "[c]reat[e] a comprehensive limited duty program in each service to more effectively return police officers and firefighters to active duty and streamline the process for retiring individuals who cannot return to full duty." D.C. Council, Report on Bill 15–32 at 2 (Dec. 9, 2003). The law added language to D.C.Code § 5–709—and a parallel section, 5–710 [8]—"clarifying that the Retirement and Relief Board ... can retire a police officer or firefighter on disability even though the individual is performing useful and efficient services that are less than the full range of duties of a police officer or firefighter." [9] *Id.* at 17. The law also added the definition of "full range of duties" found in § 5–701(19) and defined a process for putting officers on either "limited duty" or "medical leave" status. See *supra* note 7.

This background—including the fact that D.C. Law 15–194 left untouched the definition of "disabled" in § 5–701(2)—tells us that the Board no longer had the bene-

fit of applying a single clear standard when making a disability assessment. The coincidence of both standards also gives the impression that the Board's task is not strictly defined by the plain meaning of the statute, as it casts ambiguity on the language of each phrase at issue ("disabled from useful and efficient service" and "perform the full range of duties"), which ordinarily would be our "primary ... source of interpreting" the statute. *Winters v. Ridley*, 596 A.2d 569, 572 (D.C.1991); *see id.* at 572–79 (finding ambiguity and consulting legislative history where two sections "appear[ed] to be nudging [the court] in opposite directions" and the language of the statutes was not dispositive).

■ In attempting to give effect to the statute's various provisions, the Board must remain faithful to the purpose of the statute. We will not defer to the Board "where the administrative body has not considered the policy underlying the statute and has reached a result that is contrary to the purpose of the legislation and not reasonable." *O'Rourke*, 46 A.3d at 383. It is clear that in amending §§ 5–701, 5–709, and 5–710 the Council intended both to provide flexibility for the departments in determining which of its members are entitled to full or limited duty status, and to set out new guidelines for

---

by a Police and Fire Clinic physician as being capable of effectively performing certain types of work with the department." D.C.Code § 5–631(6). This status—as well as medical leave status, for officers temporarily unable to effectively perform any work with the department—is available only for officers for whom the clinic director determines "the prognosis is that the member will be able to perform a full range of duties after achieving maximum medical improvement," while those whom the clinic director determines will not be able to perform the full range of duties after achieving maximum medical improvement "shall" be recommended for disability retirement. D.C.Code §§ 5–632(a) and (d), –633(a) and (b).

8. D.C.Code § 5–710 addresses how the Board determines disability retirement for injuries incurred in the "performance of duty," while § 5–709 covers injuries incurred outside the performance of duty. The law added subsection (e–1) to § 5–710, the language of which is virtually identical to § 5–709(c).

9. The committee report notes that this clarification "addresses a Court of Appeals case that reversed a decision by the retirement board," undoubtedly a reference to *Alexander*. D.C. Council, Report on Bill 15–32 at 17 (Dec. 9, 2003).

officers' physical fitness and agility. As the Council noted in passing D.C. Law 15–194:

> The duties and responsibilities of a police officer and firefighter are physically demanding. Police officers may pursue suspects by foot and firefighters carry hundreds of pounds of equipment into and out of burning structures. It is imperative that they are in good physical condition to carry out those duties. If a police officer or firefighter is not in good condition, he or she runs the risk of not only injuring themselves, but also endangering the public safety. This is the reason behind instituting routine physical examination and physical agility test [sic].

D.C. Council, Report on Bill 15–32 at 17 (Dec. 9, 2003). This larger purpose is consistent with the Board's conclusion that, while making the disability assessment required in § 5–709, it could consider whether Officer Adgerson could *safely* perform the "full range of duties" of a police officer.

The Board did not appear, however, to derive this conclusion from the definition of "useful and efficient service," and we cannot endorse the overall interpretation of the Retirement and Disability Act the Board advances on appeal—namely, that the "useful and efficient service" standard is the one that matters most. To begin with, as noted, we do not believe this is the interpretation the Board originally used as a guide. Nowhere in the Board's order is there reasoned discussion of whether Officer Adgerson's service to the department with a fused cervical spine would be "useful" or "efficient." There is, however, repeated reference to the full range of duties, whether Adgerson's surgery kept him from performing those duties safely, and whether his condition risked an injury that would prevent him from responding in a crisis.

More fundamentally, this court's decisions interpreting § 5–701(2) and the timing of the §§ 5–709 and 5–710 amendments make clear that the words "useful and efficient service" never were meant to describe the proficiency with which a police officer or firefighter must perform the "full range of duties" of his or her position or else be subject to involuntary retirement. In the past we repeatedly have upheld the Board's defensive use of the standard now contained in § 5–701(2) to keep employees still capable of performing "useful and efficient service" from obtaining disability retirement without the department's blessing. *See Seabolt v. Police & Firemen's Ret. & Relief Bd.*, 413 A.2d 908, 910–11 (D.C.1980) (noting that the court previously held that "public policy favored the Retirement Board's '(interpretation of) the retirement laws to discourage the retirement of District of Columbia personnel who, while disabled from the performance of certain duties, can perform useful and efficient service in other capacities within their respective departments without suffering any diminution in rank or salary'" (quoting *Coakley v. Police and Firemen's Ret. & Relief Bd.*, 370 A.2d 1345, 1349 (D.C.1977))). But the offensive nature, of late, of the police and fire departments' disability retirement regime does not appear to have been contemplated in this previous interpretation.

In adding subsection (c) to § 5–709 in response to the court's *Alexander* decision, the Council essentially instructed the Board, in cases where the department initiates the retirement process, to bypass the definition of "disabled" in § 5–701(2) as interpreted by this court. This is a strange result: a member may now be involuntarily retired as "disabled" even though he is not "disabled" as the statute defines that word. But it is not an absurd result.[10] And the Board's application of

---

10. The reference in §§ 5–709(c) and 5–710(e–     1) to a "disability assessment," after which

these statutes demonstrates the reasonableness of essentially splitting the application of the two standards between offensive ("full range of duties") and defensive ("useful and efficient service"). The Board focused on applying the "perform the full range of duties" standard here, apparently deciding that the amendment to § 5–709 more directly governed the situation before it, where the department initiated retirement proceedings. Because "[r]epeals by implication are not favored," *Winters*, 596 A.2d at 574 (citations omitted), we note the continuing application of § 5–701(2) to situations where a member seeks his or her own disability retirement.[11]

■ We agree with Officer Adgerson that the main thrust of §§ 5–709(c), as well as 5–710(e–1), is to ensure that the Board retires only officers unable to "perform the full range of duties" as defined in § 5–701(19). And we agree that the ability to physically achieve these tasks is one of this standard's necessary components—its central one, in fact. But at the same time we are certain that it was reasonable for the Board to read into this performance standard the requirement that officers be able to perform these duties *safely* and without an unacceptable risk to themselves or the public. This likely would be so even if the phrase "perform the full range of duties" were unambiguous, as it implies a level of achievement and readiness beyond mere

physical accomplishment. It is not unambiguous, however, in light of the statute's context and purpose. *See Peoples Drug Stores, Inc.*, 470 A.2d at 754. The Council clearly indicated its desire for the police and fire departments to be staffed with officers and firefighters who are physically capable of performing their jobs without "injuring themselves" or "endangering the public safety." D.C. Council, Report on Bill 15–32 at 17 (Dec. 9, 2003). And the statutory amendments, which set up a separate standard for involuntary retirement procedures, endorse the departments' view that as part of this effort, they must be able to prevent their employment and pay rolls from being weighed down with personnel who because of injury or illness are no longer capable of performing those duties, even personnel who could do some other job well.

The Board wrote in its order that Dr. Malomo, whose testimony it relied on, "raised concerns that as a result of the fusion of three of the Member's cervical vertebrae, it would be unsafe for him to be on patrol due to the potential for catastrophic injury if he is engaged in physical confrontation, or if the Member becomes involved in a high-speed pursuit." Moreover, the Board found, "the risk to the public would also be serious if that injury prevented the Member from responding in case of an emergency." The Board also

---

the Board "shall" retire an officer unable to perform the full range of duties, also demonstrates that the question whether an officer is "disabled" is separate from the "full range of duties" standard that ultimately controls whether the Board will place someone on disability retirement.

11. Our decisions explaining the standard for proving a "disability" when an individual officer seeks (and the department opposes) disability retirement remain in effect. *See, e.g., DiVincenzo, supra.* The amendments to §§ 5–709 and 5–710, which on their terms apply only when the department recommends a

member for retirement, thus create a double standard in this area: It is now less burdensome for the department to retire someone involuntarily than it is for someone to obtain this status without the recommendation of the department. It is possible to see this as a result the Council supports, given that one purpose of these amendments is to provide the departments with flexibility in retirement determinations, and considering that D.C.Code § 5–710(c) favors a department recommendation. Nevertheless, the fact that the definition of "disabled" remains the same for both situations leads us to note this discrepancy.

noted that Dr. Malomo was "knowledgeable about the severity and types of injuries which members of the Department sustain" and that it thus gave "great weight" to her testimony concerning the risk of injury, which included her statements that neck injuries are common for police officers and that Adgerson was at risk of paralysis, not simply neck pain, from such an injury.

In other words, the Board felt the "perform the full range of duties standard" allowed it to retire a member who could physically perform the full range of duties safely in many instances but risked being incapacitated because of serious injury if an event that commonly happens to police officers occurred at some point in the future. We think this construction of the statute also was reasonable, given the ambiguity of the text and larger purpose of the statute, because as we read it, the decision was narrowly based on four considerations: (1) that the officer's condition put him at real and palpable risk of further injury; (2) that the risk of injury was directly tied to particular functions of police work, such as subduing suspects and participating in high-speed chases; (3) that the risked injury would be "catastrophic"; and (4) that the risked injury would incapacitate him, thus putting the public and his fellow officers at risk. Finding a member's lack of ability to perform the full range of duties based on an unacceptable risk of future injury when these factors

apply is reasonable because it ensures consistency with the purposes of the statute and guards against overreach.[12]

The reasonableness of the Board's interpretation is bolstered, finally, by the fact that the statute places the specification of the "essential functions of police work or fire suppression"—the main component of the "full range of duties"—solely within the discretion of the police and fire departments. *See* D.C.Code § 5–701(19). By allowing the departments complete control over the details of these functions, the statute vests the departments with the power to set forth objective performance criteria that all members must meet. Current MPD policy, according to the record in this case, requires that all members, "regardless of rank or assignment," be able to perform a number of "essential duty functions," including being "available to be called into uniformed patrol duty at all times, particularly in response to natural and man-made disasters or emergencies and incidents of international or domestic terrorism." This "essential function" is cited in the Board's decision, and it is directly linked to its finding that Officer Adgerson could not "perform the full duties of a member of his department."

## B. Substantial Evidence

Officer Adgerson also claims that the Board did not base its determina-

---

12. It also is appropriate that this interpretation of the statute has echoes of the "direct threat" exception under the federal Americans with Disabilities Act. *See Atkins v. Salazar*, 677 F.3d 667, 676 (5th Cir.2011) (It is an "affirmative defense under the ADA, that a disabled individual shall not pose a direct threat to the health or safety of individuals in the workplace.'" (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 12113(b))). Federal regulations narrowly define a "direct threat" as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2. An assessment of this risk must be based upon "a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence" and consideration of: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm." *Id.*

tion and factual findings on substantial evidence. "Substantial evidence is more than a mere scintilla; it is evidence that a reasonable mind might accept as adequate to support a conclusion." *Pierce v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 882 A.2d 199, 205 (D.C. 2005) (internal quotation marks omitted). "If we conclude that there was substantial evidence to support the Board's findings, we may not substitute our judgment for the Board's even though there may also be substantial evidence in the record to support a contrary finding." *Id.*

█ Because it was reasonable for the Board to interpret the statute governing its disability inquiry as allowing consideration of a narrowly defined "unacceptable risk" to the safety of the public or the officer himself, we must determine whether there was substantial evidence that Officer Adgerson's return to full duty would pose such a risk. The evidence admitted in Officer Adgerson's hearing included testimony from Dr. Malomo and Adgerson, Adgerson's medical records from the Police and Fire Clinic and his personal physicians, Dr. Ergener's memo concerning his phone call with Dr. Malomo, and various other documents related to his injuries and condition. Though both Dr. Malomo and Dr. Ergener seemed to agree that Adgerson could physically do all of the tasks of a police officer, Dr. Malomo went further and said she could not recommend his return to full duty because of the risk that

he would be seriously injured in a car crash or fight. The Board credited Dr. Malomo's opinion, which was based on her evaluation of Adgerson's condition and her review of sports medicine studies, because of her expertise and experience with injuries to police officers.

On the other hand, the Board rejected Dr. Ergener's recommendation for "a return to work with a trial of full duty" because it was not unequivocal and because Dr. Ergener did not have the same expertise in assessing risk to the public. This reasoning was enough to overcome the "treating physician's preference," in which, "[w]here there are conflicting medical opinions, the fact finder in an agency case may reject the treating physician's opinion in favor of the opinion of another physician [retained solely for the litigation] only if the agency provide[s] reasons for rejecting the opinion of the treating physician." *Beckman v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 810 A.2d 377, 386 (D.C.2002) (internal quotation marks omitted).[13]

Officer Adgerson cites another recent agency decision[14] in which the Board rejected a similar recommendation, also from Dr. Malomo, that a police officer who had a two-level cervical spinal fusion should be retired because of a disability. In that case, although Dr. Malomo pointed to the same sports medicine studies, it does not appear that she testified, as here, that the

13. The Board on appeal argues that the treating physician's preference applies only in worker's compensation cases not involving the Police and Firefighters' Retirement and Disability Act, and that in any case Dr. Malomo, from the Police and Fire Clinic, also treated Officer Adgerson and should not be considered a physician "retained solely for the litigation." *Beckman*, 810 A.2d at 386. We have, however, cited and applied the preference in cases involving the Board. *See id.* at 386–87; *Leach v. District of Columbia Police & Firefighters' Ret. & Relief Bd.*, 965 A.2d

849, 860 (D.C.2009). Because the Board gave reasons for accepting Dr. Malomo's opinion and for rejecting Dr. Ergener's, we need not decide how the preference applies to a Police and Fire Clinic doctor who provides treatment for a member but also testifies in opposition to the member's personal physician.

14. This unpublished decision by the Police and Firefighters' Retirement and Relief Board, Case No. PD10–1119, was included in petitioner's appendix.

member's condition—specifically, the number of vertebrae fused—posed a greater risk of injury or about how that risk was intensified by the particular activities of police work. Instead, the Board wrote in that case, Dr. Malomo applied a "blanket rule," without any individual assessment of the officer, "that any member who has had surgical instrumentations should not be returned to full duty because of the risk of serious injury." Most importantly, the Board in that previous case, unlike here, was presented with the opinions of two other treating physicians, both of whom recommended a return to full duty without limitations. The officer there also had struck her head on concrete while on duty and suffered no repercussions due to her double fusion, so there was additional objective evidence in the record of the previous case competing with Dr. Malomo's opinion.

It is likely, given Dr. Malomo's testimony in Adgerson's case, that she would recommend retirement for any officer with a three-level fusion. Our opinion does not prevent the Board from rejecting this recommendation in the future, however, and finding that, based on opposing opinions from other physicians and evidence in the record to the contrary, the particular member's condition would not pose an unacceptable risk of harm. What is paramount in our review is whether the Board, not the Police and Fire Clinic, made an assessment of the individual member's ability to perform the full range of police or fire duties.

Substantial evidence thus existed in the record for the Board to rely on Dr. Malomo's testimony—which was specific to Officer Adgerson's triple-fusion surgery and the types of injuries he would face as a full-duty officer—and find that he could not perform the full range of police duties without an unacceptable risk of danger to himself and the public.

## C. Other Claims

We reject Officer Adgerson's two remaining claims as well. He argues first that the Board erred in finding that his car accident in 2009 happened outside the performance of duty, a finding that reduces his retirement annuity. The Board found that Adgerson's testimony that his accident happened while he was on his way to work—with a stop along the way at the police academy to pick up training materials—established a *prima facie* case that his injury was incurred in the performance of duty but that substantial evidence rebutted this finding. *See Beckman*, 810 A.2d at 384 ("If a claimant makes a showing of an injury incurred in the line of duty, the opposing side must then offer evidence disproving the logical inference that the ensuing disability was the long term result of such injury." (citations omitted)).

Even if Officer Adgerson's testimony on its face would have established enough facts for the Board to conclude that he was entitled to any exception to the rule that off-duty injuries are not incurred in the performance of duty,[15] there was more than substantial evidence to rebut this version of events. This evidence included previous statements by Adgerson and determinations by his superiors—in writing and completed soon after the crash—that

---

15. Officer Adgerson cites, among others, *Vieira v. District of Columbia Dep't of Emp't Servs.*, 721 A.2d 579 (D.C.1998), as explaining an exception to the rule that travel to and from work is considered off-duty. *See id.* at 584 (The "usual going and coming rule" does not apply when the journey's circumstances make it "sufficiently substantial to be viewed as an integral part of the service itself."). We doubt whether Adgerson's testimony on this matter, in which he said he did not need to pick up the training materials at that time and had not been ordered to, would entitle him to this, or any other, exception.

the accident happened "off-duty" and had "no causal connection to work." The Board found, based on substantial evidence, that his "testimony that he was on his way to the academy for work-related purposes is uncorroborated by any other evidence in the record," and thus we cannot overturn the finding that his injury happened outside the performance of duty.

█ Finally, Officer Adgerson claims that the Board's order is insufficient because the same quorum of Board members who attended his hearing was not the quorum that signed the order, and because a different Board chairperson signed the order than the one who presided over his hearing.

We do not agree. The Board's duty in making a disability determination—as with any fact-finder—is certainly better served if the Board members who observed witnesses testify are the same ones who decide the case. Officer Adgerson can point to no authority in this jurisdiction, however, requiring that all of the same Board members attend the hearing and sign the written order. As Board membership changes from time to time, and as a decision of the Board can take place months after the hearing—Adgerson's case was decided more than two months later—such a rule would not even make sense.[16] He was not, as he claims, denied the opportunity to fully present his case to the Board. There was no problem, moreover, with the fact that due to a change in leadership on the Board, the chairwoman who oversaw Adgerson's hearing was not the chairperson who signed the order to ensure compliance with 7 DCMR §§ 2522.2 and 2523.3. Those regulations are about finalizing the order, not about making sure the chairperson who presided over the hearing participates in the decision.

## III.  Conclusion

The Board in Officer Adgerson's case reasonably applied an ambiguous statute involving two competing standards for disability retirement, enacted at two different times and under two different sets of circumstances. Its conclusion that the "full range of duties" standard in D.C.Code §§ 5–709(c) and 5–710(e–1) is now the primary one when the police or fire department attempts to involuntarily retire a member is one with which we agree. It was reasonable and compatible with the purposes of the statute for the Board to conclude that this standard allows for the consideration of whether an officer can perform the full range of duties without an unacceptable risk to his safety or the public's. The Board's narrow interpretation of the kind of situation where an unacceptable risk renders a member unable to perform the full range of duties was reasonable in light of the purposes of the statute and the departments' ability to define the essential functions of its members. There was, finally, substantial evidence in the record that Adgerson posed such a risk. We therefore affirm the Board's order.

16. In fact, the D.C. Administrative Procedure Act anticipates that this situation will happen. The Act does not allow, unless additional procedures are followed, an agency to issue a decision adverse to a party when "a majority of those who are to render the final order or decision did not personally hear the evidence." D.C.Code § 2–509(d). But that was not the case here, where three of the six decision-making members personally heard the evidence.